790 F.2d 984
 54 USLW 2577
 UNITED STATES of America, Appellee,
v.
Yvonne MELENDEZ-CARRION, Hilton Fernandez-Diamante, Luis
Alfredo Colon Osorio, Filiberto Ojeda Rios, Isaac
Camacho-Negron, Orlando Gonzales Claudio, Elias Samuel
Castro-Ramos and Juan Enrique Segarra Palmer, Defendants-Appellants.
 Nos. 830, 906, 874, 877, 926, 898, 881, 899, 907, 908 and
962, Dockets 85-1431, 85-1432, 85-1443, 85-1444,
85-1451 to 85-1453, 86-1010 to 86-1012
and 86-1031.
 United States Court of Appeals,
Second Circuit.
 Argued March 3, 1986.
Finally Submitted March 24, 1986.
Decided May 2, 1986.
 
 Michael E. Deutsch, Chicago, Ill., for defendant-appellant Gonzales claudio.
 John R. Williams, New Haven, Conn. (Judith Berkan, Williams and Wise, New Haven, Conn., on brief), for defendant-appellant Fernandez-Diamante.
 Jon L. Schoenhorn, Hartford, Conn. (Hurvitz, Hershinson & Schoenhorn, Hartford, Conn., on brief), for defendant-appellant Segarra Palmer.
 Richard A. Reeve, Asst. Fed. Public Defender, New Haven, Conn. (Thomas G. Dennis, Fed. Public Defender, New Haven, Conn., on brief), for defendant-appellant Camacho-Negron.
 P. Spencer Clapp, Hartford, Conn., for defendant-appellant Melendez-Carrion.
 Diane Polan, New Haven, Conn. (Peter Berkowitz, Levine & Polan, New Haven, Conn., on brief), for defendant-appellant Castro-Ramos.
 Ronald L. Kuby, New York City, for defendant-appellant Colon Osorio.
 William M. Kunstler, New York City for defendant-appellant Ojeda Rios.
 Maury S. Epner, Dept. of Justice, Washington D.C. (Stanley A. Twardy, Jr., U.S. Atty., Carmen E. Van Kirk, Asst. U.S. Atty., Hartford, Conn., on brief), for appellee.
 Leonard B. Boudin, Cheryl Howard, Eric Lieberman, Haywood Burns, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, Lewis Kornhauser, New York, N.Y., submitted a brief for amici curiae National Emergency Civil Liberties Committee et al.
 Before FEINBERG, Chief Judge, TIMBERS and NEWMAN, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 In 1984, for the first time in the two centuries of our Nation's existence, Congress enacted comprehensive national legislation providing for the preventive detention on grounds of dangerousness of those awaiting trial. Bail Reform Act of 1984, Pub.L. No. 98-473, Sec. 203(a) et seq., 98 Stat. 1976 (codified at 18 U.S.C.A. Sec. 3141 et seq. (West Supp.1985)). The Bail Reform Act of 1966 had authorized pretrial detention on grounds of dangerousness only for those accused of capital offenses, Pub.L. No. 89-465, Sec. 3(a), 80 Stat. 214, 215-16 (formerly codified at 18 U.S.C. Sec. 3148 (1982)), but no reported decision has adjudicated the constitutionality of that provision. This appeal challenges the constitutionality of preventive detention for dangerousness and the lawfulness of various steps taken in the application of the new statute. The issues arise on a consolidated appeal from orders of the District Court for the District of Connecticut (T. Emmet Clarie, Judge) detaining without bail eight defendants indicted on charges related to the September 12, 1983, armed robbery of a Wells Fargo office in West Hartford, Connecticut. For separate reasons that follow, a majority of the panel concludes that continued pretrial detention of the defendants because of dangerousness violates the Constitution. All of the other challenges of all defendants are rejected.
 
 I. Background
 
 2
 The indictment, returned August 28, 1985, charged seventeen persons, including appellants Isaac Camacho-Negron, Elias Samuel Castro-Ramos, Luis Alfredo Colon Osorio, Hilton Fernandez-Diamante, Orlando Gonzales Claudio, Ivonne Melendez-Carrion, Filiberto Ojeda Rios, and Juan Enrique Segarra Palmer, with violating the Hobbs Act, 18 U.S.C. Sec. 1951 (1982). Other charges arising out of the Wells Fargo robbery were also made against Ojeda Rios and Segarra Palmer. All of the appellants were arrested on August 30, seven in Puerto Rico and Segarra Palmer in Dallas, Texas.
 
 
 3
 The seven arrested in Puerto Rico were brought before United States Magistrate Justo Arenas in San Juan on the day of their arrest. The Magistrate stated that he would conduct removal proceedings two days later, on Sunday, September 1. During this initial presentment, the Government moved for pretrial detention pursuant to 18 U.S.C. Sec. 3142(f). For convenience, all provisions of the Bail Reform Act of 1984 will be referred to only by the appropriate section of Title 18. Appellants then moved for a five-day continuance of their bail hearings and requested postponement of removal proceedings until completion of the bail hearings. The Government objected to postponement of removal proceedings. The Magistrate ordered that removal proceedings occur as originally scheduled on September 1. Appellants then withdrew their motion for a five-day continuance and requested immediate bail hearings. Following a brief recess, the Government moved for a three-day continuance of bail hearings, contending that time was required to analyze and process weapons and other items that it had just learned had been seized pursuant to search warrants. The Magistrate granted the Government's motion and maintained the September 1 date for the removal proceedings. The Magistrate's scheduling rulings were affirmed by the District Court for the District of Puerto Rico on August 31. On September 1, the seven appellants were ordered removed to the District of Connecticut.
 
 
 4
 Segarra Palmer was brought before United States Magistrate William F. Sanderson, Jr. in Dallas on the day of his arrest. Advised of his right to a removal hearing, Segarra Palmer admitted that he was the person named in the indictment. The Magistrate on his own motion decided to proceed with a detention hearing pursuant to section 3142(f)(2). Segarra Palmer was advised by the Magistrate that he could elect a bail hearing immediately in Dallas or, after removal, in Connecticut. Segarra Palmer chose the latter option. The Magistrate then ordered his removal to the District of Connecticut.
 
 
 5
 The seven appellants arrested in Puerto Rico arrived in Hartford, Connecticut, on September 3 and were promptly presented before United States Magistrate F. Owen Eagan. Appellants were represented by counsel. The Government stated, with respect to bail hearings, that its three-day continuance, granted in Puerto Rico, would expire on September 5. The Government took the position that the three days of the Labor Day weekend were excluded from the three-day continuance. The Government announced its readiness to begin bail hearings on September 5. Appellants then moved for a continuance until September 17. Magistrate Eagan granted a continuance until September 13. On September 9, Segarra Palmer arrived in Hartford and was promptly presented before Magistrate Eagan. Segarra Palmer requested and was granted a continuance of his bail hearing until September 13, the same day previously set for the hearings of his co-defendants.
 
 
 6
 Hearings began on September 13, focusing initially on various motions made by some or all of the defendants. The hearings continued on Saturday, September 14, and resumed on Tuesday, September 17. The Magistrate decided to conduct the evidentiary phase of the bail hearings individually for each defendant. The sequence of hearings, though not the fact of separate hearings, was agreed to by the defendants. The hearings occurred from September 17 through October 7.
 
 
 7
 With respect to all eight appellants the Government presented evidence of the risks of both flight and dangerousness. The evidence concerned the Wells Fargo robbery, in which $7.6 million was taken, and each appellant's connection with a group known as "Los Macheteros" (the machete wielders), which had claimed responsibility for the robbery. The group was identified as a paramilitary, terrorist organization that had committed various crimes, including the Wells Fargo robbery, to advance the cause of Puerto Rican independence. The evidence pertinent to the claims of each appellant will be discussed as those claims are considered. At the conclusion of the hearings, the Magistrate ordered Camacho-Negron, Colon Osorio, Ojeda Rios, and Segarra Palmer detained because of both flight and dangerousness, Gonzales Claudio detained solely because of dangerousness, Fernandez-Diamante detained solely because of flight, and Castro-Ramos and Melendez-Carrion released on bail of $500,000 and $250,000, respectively. Judge Clarie affirmed the Magistrate's orders of detention with respect to Camacho-Negron, Colon Osorio, Fernandez-Diamante, Gonzales Claudio, Ojeda Rios, and Segarra Palmer, though affirmance with respect to Camacho-Negron was solely on grounds of dangerousness. However, the District Judge, acting on the Government's appeal, reversed the orders setting bail for Castro-Ramos and Melendez-Carrion and ordered both detained on grounds of both flight and dangerousness. Thus, as the defendants' appeal comes to this Court, two defendants, Camacho-Negron and Gonzales Claudio, have been detained solely because of dangerousness, Fernandez-Diamante has been detained solely because of flight, and the other five defendants have been detained on grounds of both flight and dangerousness.
 
 II. Procedural Challenges
 
 8
 We consider first a series of contentions, advanced by some or all of the appellants, that the Government failed to observe procedural requirements of the Bail Reform Act in the events leading up to the entry of detention orders. Most of these contentions concern compliance with the time requirements of the Act, specified in section 3142(f). Subsection (f) provides that a detention hearing shall be held "immediately upon the person's first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance." It further provides, "Except for good cause, a continuance on motion of the person may not exceed five days, and a continuance on motion of the attorney for the Government may not exceed three days."
 
 
 9
 The initial objection is to the decision of the Magistrate in Puerto Rico to schedule the removal hearing prior to the detention hearing. Neither the Bail Reform Act nor Fed.R.Crim.P. 40 governing removal hearings specifies the sequence for a detention hearing and a removal hearing. We agree with the conclusion recently reached by the Seventh Circuit that a removal hearing may precede a detention hearing, leaving the latter normally to occur in the district of prosecution after removal. United States v. Dominguez, 783 F.2d 702, 704-05 (7th Cir.1986). There is no indication that Congress, in specifying that a detention hearing shall occur, absent continuances, upon the defendant's "first appearance" before a judicial officer, considered the context of an arrest in a district other than the district of prosecution. As the Seventh Circuit pointed out, it is highly unlikely that Congress would have wanted detention hearings to occur in districts scattered across the country in which those accused in multi-defendant cases might happen to be arrested. The decision whether to seek detention and the evidence necessary to support a finding of dangerousness and risk of flight sufficient to justify detention will normally be located primarily in the district of prosecution. We recognize that the evidence a defendant might wish to present concerning roots in the community and other factors that might meet the Government's evidence will be more available in the district of arrest whenever he is arrested in the district of his residence. Though we do not believe that circumstance requires that the detention hearing occur, prior to removal, in the district of arrest, the proximity of evidence need not be totally disregarded by magistrates in such districts. Where practical, consideration should be given to affording the defendant, arrested in his district of residence, an opportunity in that district promptly to present locally available evidence pertinent to the issue of pretrial release so that a transcript of such evidence can be prepared and furnished to the judicial officer making the detention decision in the district of prosecution.
 
 
 10
 Appellants next contend that it was improper for the Magistrate in Puerto Rico to grant the Government's request for a three-day continuance of the detention hearing after the Government had initially announced its readiness for an immediate hearing. We see no reason why the Government was not entitled to change its mind and seek the three-day continuance provided by the Act. The decision was not capricious, having been made only after learning the results of searches conducted on the day of the arrests.
 
 
 11
 Appellants next contend that Saturdays, Sundays, and holidays are included in the three-day period of the continuance the Government may request and that the continuance granted on August 30 included the three-day Labor Day weekend of August 31-September 2. The argument is based on a comparison of section 3142(f), which makes no mention of excluding weekends and holidays from the three- and five-day periods of authorized continuances, with section 3142(d), which explicitly excludes weekends and holidays from the ten-day detention period authorized for aliens and for citizens who were awaiting trial or sentence or were on parole at the time of the alleged offense. The Government responds that the omission of an exclusion for weekends and holidays from section 3142(f) does not mean that Congress meant to include them; rather, it means that Congress was legislating in light of Fed.R.Crim.P. 45(a), which, on the date of enactment of the Bail Reform Act, October 12, 1984, specified that weekends and holidays were to be excluded in computing allowable time periods of less than seven days (currently less than eleven days). To this appellants reply that Criminal Rule 45(a) does not apply to time periods set forth in statutes, a conclusion drawn from comparison with the corresponding Civil Rule 6(a), which explicitly applies to time periods prescribed by statute.
 
 
 12
 We do not believe the difference in wording of Civil Rule 6(a) and Criminal Rule 45(a) on this point has any significance. We have applied the time computation provisions of Rule 45(a) in determining compliance with time requirements of a treaty. See Liberto v. Emery, 724 F.2d 23 (2d Cir.1983) (per curiam). We agree with the Government that time computation for the short intervals set forth in section 3142(f) is governed by Rule 45(a). But see United States v. Hurtado, 779 F.2d 1467, 1474 n. 8 (11th Cir.1985). Hence the Government's readiness to proceed with detention hearings in Connecticut on September 5 was timely. In any event, since we hold that the pertinent appearance for purposes of section 3142(f) is the first appearance before a judicial officer in the district of prosecution, the Government was entitled to seek a continuance of three days from September 3. Though it would have been preferable for the Government to seek the three-day continuance on September 3 upon the defendants' first appearance before the Magistrate in Connecticut, we see no reason to disregard the three-day continuance granted by the Magistrate in Puerto Rico.
 
 
 13
 Some of the appellants claim that Magistrate Eagan erred in granting their motions for a continuance. The seven defendants arrested in Puerto Rico sought a fourteen-day continuance and were granted a ten-day continuance. Their complaint is not that the delay was four days too short, but that it was too long. Their principal point is that no continuance would have been needed had the detention hearings been held in Puerto Rico prior to removal. Since, as we have ruled, they were not entitled to detention hearings prior to removal, they cannot complain that removal created circumstances justifying the continuance that they sought. The Magistrate granted the continuance to afford time to obtain witnesses and affidavits from Puerto Rico, to enable the English-speaking defense attorneys in Connecticut to obtain interpreters and effectively interview their clients, and to permit the defense attorneys in Puerto Rico an opportunity to visit their clients in Connecticut. These were substantial reasons pertinent to protection of the rights of the defendants. The continuance was not for the convenience of counsel, a ground condemned in United States v. Al-Azzawy, 768 F.2d 1141, 1146 (9th Cir.1985). Nor is there merit to Segarra Palmer's claim that it was error to grant his motion for a four-day continuance without written findings of good cause. The "good cause" requirement of section 3142(f) applies only to a defendant's motion for a continuance in excess of five days.
 
 
 14
 Segarra Palmer also contends that the continuance provisions of the Act were violated by the ten-day period that elapsed during his removal from Dallas to Hartford. Magistrate Eagan ruled that Segarra Palmer's uncounseled waiver of a removal hearing entitled him to be returned to Dallas, if he preferred, so that his right to a removal hearing could be exercised or waived with the benefit of counsel. In Hartford, Segarra Palmer, with the advice of counsel, waived this opportunity. He appears to contend, nevertheless, that the transportation time amounted to a "continuance" of his detention hearing, for which no finding of good cause was made. His argument fails in light of our ruling that he was not entitled to a detention hearing prior to removal. The detention hearing "clock" began to run at his first appearance in Connecticut. Segarra Palmer also contends that ten days was an undue amount of time to accomplish his removal. Though expeditious removal may occur prior to the start of the detention hearing "clock," the congressional purpose of assuring prompt detention hearings would be defeated if removal were accomplished at a needlessly slow pace. We doubt that ten days was the minimum time required to remove Segarra Palmer from Dallas to Hartford. However, we have no basis to rule from the sparse record concerning the details of the transportation that the arrangements made by the Government were so dilatory as to warrant the sanction of release. This is an aspect of detention procedure, however, with which the Government should be concerned in future cases.
 
 
 15
 The final challenge concerning scheduling is that Magistrate Eagan did not act with sufficient expedition in the conduct of the detention hearings. The record belies the claim. It reveals a conscientious judicial officer, besieged with a barrage of motions, endeavoring to act with scrupulous fairness to all defendants, while mindful of the fact that the defendants remained incarcerated throughout the process of determining whether to grant the Government's motions for detention orders. The objection that the Magistrate adjourned the hearings on September 16 to honor the request counsel had made to observe Rosh Hashanah is frivolous, especially in light of the Magistrate's decision to keep the hearings in session on Saturday, September 14, to replace the Monday religious holiday.
 
 
 16
 Somewhat more troubling is the contention that time was needlessly consumed by the Magistrate's decision to hold individual detention hearings and by the failure of the District of Connecticut to assign additional magistrates or district judges to share the task of conducting these individual hearings. The overall interval needed to conduct the hearings lasted from September 13 to October 7, a period by no means excessive in view of the fact that eight defendants required hearings. Though we do not believe any error warranting relief was committed by proceeding with individual hearings before a single judicial officer, we think that in future multi-defendant cases the issues of whether to hold a joint detention hearing or whether to assign more than one judicial officer should receive more searching attention.
 
 
 17
 The choice of joint versus individual hearings must rest largely in the discretion of the judicial officer to whom the hearing task is entrusted. A joint hearing, with the active participation of numerous defense counsel, may sometimes consume more time than a series of individual hearings. In this case there was an attempt to conduct jointly some facets of the proceedings, which led to what Judge Clarie characterized as confusion and chaos. One approach worth considering is to proceed jointly at least to receive the testimony of Government witnesses common to all, or virtually all, defendants. In this case, for example, a special agent of the Federal Bureau of Investigation gave testimony about the offense and about the background of "Los Macheteros" that had to be repeated in whole or in part seven times. Consolidation to receive that testimony, followed by individual hearings to receive evidence peculiar to each defendant, might prove useful.
 
 
 18
 Whether to use one or more judicial officers is also a matter largely within the discretion of those with responsibility for conducting the business of the judicial district as a whole. Surely all the judicial business of a district need not come to an abrupt stop simply because the Government seeks detention orders in a multi-defendant case. On the other hand, detention orders deserve special consideration. Though the Act could not possibly be thought to require assignment of each defendant's hearing to a different judicial officer, it would not seem to be an undue imposition on the resources of a judicial district with four magistrates in close proximity to enlist two of them to share the detention hearing assignment. We disagree with the District Judge that the possibility of disparate treatment between defendants is a valid reason for not assigning the hearings to more than one judicial officer. Assessing the entirety of what occurred in this case, however, we see no basis for granting any relief on grounds of undue delay.
 
 
 19
 Appellants next contend that they did not receive proper notice of the grounds on which the Government would seek pretrial detention. Section 3142(e) authorizes detention if no conditions of release will reasonably assure "the appearance of the person as required and the safety of any other person and the community." Appellants argue that they are entitled to have the Government specify in its request for a detention order whether detention will be sought on grounds of flight or dangerousness or both. They point out that evidence to oppose a request for detention on each of the two statutory grounds might well be different. The Government responds, first, that the statute does not specify that the motion for detention must state the grounds relied on, and, second, that imposing such a requirement "might well result in the government's simply declaring in every case that detention is warranted on both grounds." Brief for Appellee at 79. We reject this latter argument out of hand. It is astonishing for a prosecutor to contend that if grounds for relief sought must be specified, the Government will routinely allege all grounds mentioned in the governing statute. Every lawyer has an obligation to file pleadings only in a good-faith belief that valid grounds exist for the relief sought, an obligation that should weigh heavily with those exercising the power of public prosecution. See United States v. Berger, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed.2d 1314 (1935).
 
 
 20
 The response that specification of grounds is not required is equally without merit. Though the statute does not contain such a requirement, it is plainly set forth in Rule 47 of the Federal Rules of Criminal Procedure: "A motion ... shall state the grounds upon which it is made...." The Government, which properly avails itself of the time computation provisions of Rule 45, is equally obliged to respect the motion practice provisions of Rule 47. The requisite "grounds" for a detention motion should include specification of flight, dangerousness, or both, depending on the prosecutor's good-faith belief in the grounds that can be established. In addition, if detention is sought under section 3142(f)(2)(B) on the ground of risk of threat or injury to a witness or juror, or other obstruction of justice, that specific ground should be alleged. In accordance with Rule 47, the motion may be made orally, if permitted by the Court. In this case the detention motion was made orally before the Magistrate in Puerto Rico, and approval for proceeding on that oral motion was explicitly given by the Magistrate in Connecticut.
 
 
 21
 The lack of compliance with Rule 47 in this case does not, however, warrant any relief from the detention orders. The Government did not allege risk of harm to a witness or juror, the type of ground that would normally require specification in order to mount a proper defense. Examination of the detention hearings in this case indicates that the defendants fully challenged the Government's generalized motion by disputing the risks of both danger to the community and flight.
 
 
 22
 The final procedural contention concerns a claim of non-compliance with 18 U.S.C. Sec. 2518(9), which prohibits the introduction at any hearing of evidence derived from electronic surveillance unless each party has been furnished at least ten days before the hearing with a copy of the court order for the surveillance and the accompanying application. The purpose of this requirement is to afford the defendant "an opportunity to make a pretrial motion to suppress...." S.Rep. No. 1097, 90th Cong., 2d Sess. 105-06, reprinted in 1968 U.S. Code Cong. & Ad.News 2112, 2195. Section 2518(9) also provides that the court may waive the ten-day requirement upon a finding that it was not possible to furnish the required documents timely and that no prejudice will result. In this case the District Court made the requisite findings, which are abundantly supported in the record. The bulk of the required material was furnished a week before the detention hearing of the first defendant, and all defendants were able to make a motion to suppress the results of the electronic surveillance.
 
 
 23
 III. The Findings of Risk of Flight and Dangerousness
 
 
 24
 Six appellants, all except Ojeda Rios and Segarra Palmer, challenge the findings that they present a risk of flight or danger to the community, or, in some cases, both, sufficient to support their detention. In this Circuit findings with respect to risk of flight or dangerousness may not be disturbed unless clearly erroneous. United States v. Martir, 782 F.2d 1141, 1146 (2d Cir.1986); United States v. Colombo, 777 F.2d 96, 100 (2d Cir.1985); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir.1985). At least that is the standard of review with respect to the ascertainment of historical facts underlying the conclusion that the defendant is a risk to flee or poses a danger to the community. Any error in the application of the pertinent legal standard is of course subject to broader review. The ultimate determination of risk of flight would normally seem to be as subject to the "clearly erroneous" standard of review as the underlying historical facts. On the other hand, "danger to the community" is not as clear a concept as risk of flight and has not been fully developed as a basis for pretrial detention. Application of the "dangerousness" ground for pretrial detention may therefore implicate legal interpretations to a degree somewhat greater than the ground of risk of flight, with a corresponding broader scope of review.
 
 
 25
 Evidence presented against all eight appellants, including the six who challenge the detention findings, provided ample basis for believing, by the "clear and convincing" standard applicable to findings of dangerousness, section 3142(f), that each is an active member of Los Macheteros. In addition to claiming responsibility for the Wells Fargo robbery, this organization has undertaken various acts of violence, including an operation known as "La Gaviota," in which nine aircraft of the Puerto Rico National Guard were destroyed by explosives at the Muniz Air Base in Puerto Rico.
 
 
 26
 Fernandez-Diamante was ordered detained solely for risk of flight. Evidence showed that he had knowledge of and access to Los Macheteros safe houses, that he had assisted a convicted felon, formerly a member of Los Macheteros, to escape detection, and that he had recently traveled to Costa Rica and Panama for purposes not explained to customs officials, though his ability to finance such travel was placed in doubt by his unemployment for the three months preceding his arrest and his qualification for subsidized housing. A search of his home revealed documents reflecting contacts in foreign countries and signs to be used in making contacts.
 
 
 27
 Colon Osorio was ordered detained because of both risk of flight and dangerousness. Evidence showed that he had been identified by Ojeda Rios as a valuable person in military operations of Los Macheteros. He had planned with Ojeda Rios an operation known as "El Chivo" to bribe prison guards to arrange the release of imprisoned members of the organization, including an informant who was slated to be murdered. The plan was not carried out. A search of his home disclosed military manuals, code books, twenty remote control receivers adapted to complete electrical circuits of the type used for explosive devices, and booby trap switches used to fire explosive devices. He has a long history of using aliases.
 
 
 28
 Castro-Ramos, though admitted to bail by the Magistrate, was ordered detained by the District Judge because of both flight and dangerousness. Upon his arrest, he told the arresting agents that he would remember their faces and that their families would pay. He had access to a Machetero safe house. Found at his house was an envelope containing his brother-in-law's passport with the photo obliterated and several passport-size photos of Castro-Ramos. Evidence indicated that he had participated in three Machetero operations and has supervisory authority over all armed actions of the organization. He has previously been convicted of a firearms offense, and a large quantity of chemical explosives was found in his possession when he was arrested for that offense.
 
 
 29
 Camacho-Negron was ordered detained by the Magistrate because of both flight and dangerousness; the District Judge, considering only the finding of dangerousness, upheld it. Evidence indicated that Camacho-Negron had played a role in the La Gaviota operation in which National Guard planes had been destroyed. Though acknowledging that he was on duty in the Guard and stationed at the Muniz Air Base the day of the attack, he contends he could not have been involved since he had recently broken his leg and was wearing a substantial cast. However, that circumstance does not preclude his having planned the operation and served as an inside man. His role in La Gaviota was confirmed by Segarra Palmer in an intercepted communication.
 
 
 30
 Gonzales Claudio was ordered detained solely for dangerousness. Evidence indicated that he participated in the La Gaviota attack and in another Machetero operation in which a bus carrying United States Navy personnel was fired upon, resulting in the deaths of two sailors and the wounding of nine others.
 
 
 31
 Melendez-Carrion, though admitted to bail by the Magistrate, was ordered detained by the District Judge on grounds of both flight and dangerousness. Evidence indicated that she was a member of a Machetero combat unit and had been trained in sabotage and weapons assembly. On one occasion she participated with other Machetero members in a critique of an operation in which a federal courthouse was attacked with a rocket. A search of her home disclosed a semi-automatic pistol, two .357 pistols, a submachine gun, and other weapons and ammunition. The evidence as to flight included the following circumstances. She had been offered access to a Machetero safe house shortly before her arrest and thus had knowledge of its location and the opportunity to use it to escape detection. A search of her home revealed articles of disguise. She had been observed repeatedly driving evasively in an effort to avoid surveillance.
 
 
 32
 We are satisfied that all of the findings of flight and dangerousness ultimately made by the District Judge are adequately supported by the evidence.
 
 IV. The Validity of Preventive Detention
 
 33
 Since appellants' challenges to the sufficiency of the evidence to support the findings of dangerousness are without merit, the validity of preventive detention under section 3142(e) must be faced. That is an issue not yet considered in this Circuit. See United States v. Colombo, supra, 777 F.2d at 101 n. 2. Before facing the constitutional challenges to the provision, we consider whether section 3142(e) can reasonably be construed to prohibit detention for dangerousness for the length of time these appellants have been confined.
 
 A. Statutory Construction
 
 34
 The Bail Reform Act itself contains no time limits on the period of detention. In Colombo we observed that Congress was relying on the time limits of the Speedy Trial Act, 18 U.S.C. Sec. 3161 et seq. (1982), to provide the limits on pretrial detention. That Act sets 90 days as the normal limit for pretrial detention, id. Sec. 3164(b), but specifically provides that the periods of delay enumerated in section 3161(h) are excluded in computing the time limit set by section 3164(b). We note, however, that some statements made during Senate debate on the bill that became the Bail Reform Act lend support to the view that an absolute 90-day limit, without exceptions, was contemplated. Speaking in opposition to an amendment that would have reduced the 90-day limit of section 3164(b) to 60 days, Senator Thurmond told the Senate that "the 90 days is the worst case limit," 130 Cong.Rec. S941 (daily ed. Feb. 3, 1984), Senator Laxalt called the 90-day limit the "upper bound," id. at S943, and Senator Grassley relied on the 90-day limit to assure his colleagues that "no defendant will be detained indefinitely while the processes of justice grind to a halt," id. at S945.
 
 
 35
 However, during this same debate the excludable time provisions of the Speedy Trial act were specifically cited by the proponents of the 60-day amendment to assure the Senate that acceptance of the amendment would not impose an absolute ceiling. Id. at S941 (statement of Senator Specter); id. at S945 (statement of Senator Mitchell). Moreover, the Senate Report explicitly notes that the preventive detention provision that became section 3142(e) did not include the absolute 60-day time limit of the District of Columbia provision, D.C. Code Sec. 23-1322(d)(2)(A) (1973), but instead was governed only by the 90-day limit of the Speedy Trial Act "subject to certain periods of excludable delay." S.Rep. No. 225, 98th Cong., 2d Sess. 22 n. 63, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3205.
 
 
 36
 It may well be that the Senate did not fully appreciate just how long pretrial detention might last under the exclusions of the Speedy Trial Act, but there can be no serious claim that section 3142(e), as enacted, limits pretrial detention more restrictively than the Speedy Trial Act.
 
 B. Constitutionality
 
 37
 We therefore confront the fundamental issue whether the Constitution permits the detention of an adult accused of a crime for the purpose of preventing him from committing other crimes during the interval between his arrest and his trial. Two amendments are pertinent to this issue--the Eighth Amendment prohibiting excessive bail and the Fifth Amendment prohibiting the deprivation of liberty without due process of law.
 
 
 38
 The Eighth Amendment. The literal prohibition of the Eighth Amendment concerns only the amount of bail, a matter not in issue when an arrested person is detained pending trial without any amount of bail being set. Nevertheless, the question remains whether the Eighth Amendment implies a right to have some amount of bail set in every case. Appellants contend that the Bail Clause necessarily carries this implication. It would be illogical, they assert, for the Framers to have forbidden excessive amounts of bail yet permitted this prohibition to be circumvented by not setting bail in any amount. Or, to put the matter another way, failure to set bail must be prohibited because it denies the liberty of an arrested person in precisely the same manner as setting bail in an amount so excessive that it cannot possibly be posted. The argument has surface appeal, but it has already been implicitly rejected in decisions recognizing that bail may be denied where no conditions of release will provide satisfactory assurance of a defendant's presence at trial. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); United States v. Martir, supra. We agree with the Government that the Eighth Amendment does not imply the existence of an absolute right to bail in all cases. See Carlson v. Landon, 342 U.S. 524, 544-46, 72 S.Ct. 525, 536-37, 96 L.Ed. 547 (1952); United States v. Kostadinov, 721 F.2d 411, 413 (2d Cir.1983) (per curiam).
 
 
 39
 We do not agree, however, with the Government's further contention that the Eighth Amendment, by failing to guarantee a right to bail in all cases, implies a broad authority in Congress to determine the circumstances in which bail may be denied, specifically including the circumstance that a person lawfully arrested is thought to be a danger to the community if released before trial. For this sweeping proposition, the Government relies on the history of bail, attaching special significance to the absence of an unqualified right to bail in capital cases. We agree that the absence of an unqualified right to bail in capital cases is pertinent, but we think that circumstance does not resolve the issue whether bail may be denied, prior to trial, on grounds of dangerousness. If anything, the history of bail suggests that dangerousness is not a permissible ground for pretrial detention.
 
 
 40
 At common law in England pretrial release on bail was a matter within the discretion of judges for all defendants, including those charged with capital offenses. 4 W. Blackstone, Commentaries 298 (4th ed.1899); 1 J. Chitty, Criminal Law 93 (London 1816). In this country the First Judiciary Act, drafted by the Framers of the Eighth Amendment, provided a right to bail in all cases except capital offenses, but left bail in those cases to the discretion of the judges. The Act permitted bail to be set in capital cases "by the supreme or a circuit court, or by a justice of the supreme court, or a judge of a district court, who shall exercise their discretion therein, regarding the nature and circumstances of the offense, and of the evidence, and the usages of law." Judiciary Act of 1789, ch. 20, 1 Stat. 91. State constitutions also permitted bail in some capital cases, many provisions being modeled after Connecticut's constitution, which provided that all prisoners shall be bailable before conviction "except for capital offenses, where the proof is evident, or the presumption great." Conn. Const. art. I, Sec. 14 (1818). Even though the category of capital offenses narrowed, federal law left the matter of bail for the few remaining capital offenses within the discretion of federal judges. See, e.g., United States v. Egorov, 319 F.2d 817 (2d Cir.) (per curiam) (bail for espionage offense denied as a matter of discretion), cert. dismissed, 375 U.S. 926, 84 S.Ct. 329, 11 L.Ed.2d 261 (1963); Fed.R.Crim.P. 46(a)(1) (1946).
 
 
 41
 The historical question is whether the discretionary authority of judges to deny bail in capital cases could be exercised because of the dangerousness of the defendant or only because of a risk of flight, a risk surely increased by the prospect of the death penalty. Former Attorney General Mitchell, arguing in favor of the constitutionality of the preventive detention proposal that ultimately became section 3142(e), has asserted that "the eighth amendment when adopted clearly permitted pretrial detention for capital crimes because of danger to the community." Mitchell, Bail Reform and the Constitutionality of Pretrial Detention, 55 Va.L.Rev. 1223, 1230 (1969). No historical materials are cited for this assertion. The New Jersey Supreme Court reached a different conclusion after its survey of the historical materials. "The underlying motive for denying bail in the prescribed type of capital offenses is to assure the accused's presence at trial." State v. Konigsberg, 33 N.J. 367, 164 A.2d 740, 743 (1960). The Court also concluded that risk of flight to avoid the death penalty was the explanation why the Framers did not guarantee an absolute right to bail in the Constitution. "In a choice between hazarding his life before a jury and forfeiting his or his sureties' property, the framers of the Constitution obviously reacted to man's undoubted urge to prefer the latter." Id. (citation omitted). See also United States v. Edwards, 430 A.2d 1321, 1326 n. 6 (D.C.App.1981) (in banc) (citation omitted), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). Commentators have reached the same conclusion. See Tribe, An Ounce of Detention: Preventive Justice in the World of John Mitchell, 56 Va.L.Rev. 370, 377 (1970); Hickey, Preventive Detention and the Crime of Being Dangerous, 58 Geo. L.J. 287, 287 (1969).
 
 
 42
 Since risk of flight has always been at least the dominant, if not exclusive, reason for holding a defendant in lieu of bail, the burden of demonstrating that dangerousness was also a permissible basis for denying bail would seem to be upon those who make this assertion. No materials thus far examined bear out the claim. It seems far more reasonable to think that the lack of an absolute right to bail in 1790 for such capital offenses as counterfeiting stemmed from concern that the defendant would flee to avoid any possibility of the death penalty and not concern that his pretrial release posed a danger to the community. See Federal Crimes Act of 1790, ch. 9, 1 Stat. 112, 115.
 
 
 43
 The conclusions reasonably to be drawn from the historical materials is that the Framers of the Eighth Amendment did not regard bail as an absolute right in all cases, but that they also did not contemplate the denial of bail on grounds of dangerousness. That does not mean that the Eighth Amendment can fairly be construed to prohibit denial of bail on grounds of dangerousness. It does mean, however, that in considering the ultimate issue whether Congress' power to define the categories in which bail is not available includes the power to authorize pretrial detention on grounds of dangerousness, the absence of historical support for the practice in the Anglo-American tradition is of some significance. That ultimate issue arises under the Due Process Clause of the Fifth Amendment.
 
 
 44
 The Fifth Amendment. We turn then to the issue whether preventive detention of a competent adult for dangerousness is a deprivation of liberty without due process of law in violation of the Fifth Amendment. Obviously there is a deprivation of liberty. Indeed, physical confinement of an individual is the ultimate deprivation of liberty. Of course the right to the enjoyment of liberty from confinement is not absolute. The right may be denied as punishment upon conviction of a crime, and it may be denied in some limited circumstances as regulation, for example, to prevent the spread of contagious disease. The Government does not dispute that detention of a competent adult to prevent the commission of crime may not be imposed as punishment unless there has been an adjudication of guilt. See Bell v. Wolfish, supra. It maintains, however, that the detention authorized by section 3142(e) serves the purposes of regulation, and its constitutionality is therefore to be tested by standards pertinent to regulation rather than to punishment.
 
 
 45
 The Supreme Court has instructed that the initial inquiry in determining whether a statute regulates or punishes concerns the purpose for which the statute was enacted. See Schall v. Martin, 467 U.S. 253, 269, 104 S.Ct. 2403, 2412-13, 81 L.Ed.2d 207 (1984); Bell v. Wolfish, supra, 441 U.S. at 538, 99 S.Ct. at 1873; Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 657-68, 9 L.Ed.2d 644 (1963). Of the cited authorities, Schall is most pertinent because it faced the issue of regulation versus punishment in the context of pretrial detention to prevent the commission of future crimes. In finding a regulatory purpose of New York's juvenile preventive detention statute, the Court identified several pertinent factors. First, the Court noted that the detention is strictly limited in time. The "maximum possible detention" was said to be seventeen days.[1] 467 U.S. at 270, 104 S.Ct. at 2413. Second, the Court observed that the relatively mild conditions of confinement "reflect[ed]" a regulatory purpose. Id. The detained juveniles were confined in either non-secure halfway houses without locks, bars, or security officers, or in secure facilities where the children lived in dormitories, based on age, size, and behavior, wore street clothes, and participated in educational, recreational, and counseling sessions. The Court also noted that the state statute required consideration of the best interests of the child in all proceedings, including detention hearings, N.Y. Fam.Ct. Act Sec. 301.1 (McKinney 1983), that a regulatory purpose has been identified by the authoritative state court construction of the statute, People ex rel. Wayburn v. Schupf, 39 N.Y.2d 682, 385 N.Y.S.2d 518, 350 N.E.2d 906 (1976), and that the laws of all the states authorize preventive detention of juveniles.
 
 
 46
 Analysis of these factors as applied to section 3142(e) places the challenged provision decidedly closer to the punitive side of the line than the New York juvenile detention statute. First, the detention period is not strictly limited in time. As we have seen, the period of detention may extend throughout the full period of pretrial delay permissible under the Speedy Trial Act. That period, though nominally limited to ninety days, 18 U.S.C. Sec. 3164(b), can be extended for a variety of reasons. No absolute outer limit is specified, and delays can last for more than a year. In this case detention has already lasted for eight months. Second, the conditions of confinement cannot be characterized as mild. Though the appellants are not confined with sentenced prisoners,[2] some have been housed in administrative detention cells of secure facilities and confined to their cells for twenty-three hours a day. Third, unlike the juvenile statute considered in Schall, section 3142(e) does not purport to require consideration of the best interests of the defendant in the determination of detention. Finally, pretrial preventive detention has never been part of the general American approach to criminal justice.
 
 
 47
 We recognize, of course, that the dominant legislative purpose in enacting section 3142(e) was to safeguard the community from future crimes that the accused person might commit if released. Whether this purpose is sufficient to classify the statute as regulatory is not so clear as the Government contends. The difficulty arises from the undeniable fact that incarceration to protect society from a person's future criminal conduct is regulatory in a sense but at the same time also achieves one of the classic purposes of punishment--incapacitation. Thus, this is not a situation like that encountered in Kennedy v. Mendoza-Martinez, supra, where the adverse action, deprivation of citizenship imposed for remaining outside the country to evade military service, could be argued to have been imposed for the purpose of achieving either the penal effect of deterring misconduct or the regulatory effect of avoiding foreign policy entanglements.[3] Here, the single effect relied on by the Government, prevention of future crime, is evidence of both a regulatory and a penal purpose. As the Supreme Court has observed, "One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment." United States v. Brown, 381 U.S. 437, 458, 85 S.Ct. 1707, 1720, 14 L.Ed.2d 484 (1965).
 
 
 48
 Despite the penal effects of pretrial detention imposed upon those deemed dangerous, we are willing to assume that section 3142(e) was enacted by Congress primarily as a regulatory measure and that its constitutionality is to be determined accordingly. Evident throughout the legislative history is congressional concern to view preventive detention as regulation rather than punishment. In particular, Congress was pointedly legislating against the background of the decision of the District of Columbia Court of Appeals in United States v. Edwards, supra, upholding the constitutionality of the District of Columbia preventive detention statute, D.C.Code Sec. 23-1322 (1973). See S.Rep. No. 225, 98th Cong., 2d Sess. 8, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3190-91. A predominant regulatory purpose of section 3142(e) has been widely identified. See United States v. Portes, 786 F.2d 758, 762 (7th Cir.1986); United States v. Maull, 773 F.2d 1479, 1485 (8th Cir.1985) (in banc); United States v. Jessup, 757 F.2d 378, 387 (1st Cir.1985).
 
 
 49
 Viewing section 3142(e) as a regulatory measure, we consider whether it comports with the requirements of the Due Process Clause. On this issue a majority of the panel concludes, for different reasons, that the limitations of the Due Process Clause have been exceeded in this case. Chief Judge Feinberg concludes, for reasons set forth in his concurring opinion, that the pretrial detention for dangerousness authorized by section 3142(e), though initially regulatory in nature, has become punitive as applied to Gonzales Claudio and Camacho-Negron, the only defendants detained solely on the ground of dangerousness, because their pretrial detention has now lasted more than eight months. Approaching the problem somewhat differently, I first consider whether section 3142(e) may constitutionally authorize pretrial detention on grounds of dangerousness for any length of time as a regulatory measure. Concluding that it may not, I do not reach the further question as to how long pretrial detention for dangerousness may be imposed before it becomes punishment. The remaining portion of this section sets forth my views on the due process issue.
 
 
 50
 In Schall v. Martin, supra, the Supreme Court began its consideration of the due process issue by comparing the substantiality of the Government interest sought to be advanced by preventive detention with the nature of the liberty interest of those detained. That comparison revealed a weighty governmental interest in protecting society and a substantial, though limited, interest on the part of juveniles in remaining free of state-ordered confinement. Though acknowledging that children have a "substantial" interest in freedom from institutional confinement, the Court ruled that this interest "must be qualified by the recognition that juveniles, unlike adults, are always in some form of custody." 467 U.S. at 265, 104 S.Ct. at 2410 (emphasis added) (citation omitted). This qualified liberty interest of juveniles, the Court concluded, "may, in appropriate circumstances, be subordinated to the State's 'parens patriae interest in preserving and promoting the welfare of the child.' " Id. (quoting Santosky v. Kramer, 455 U.S. 745, 766, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982)).
 
 
 51
 Applying Schall to section 3142(e), one encounters not only the weighty governmental interest in safeguarding the community but also the full liberty interest of competent adults. Schall does not instruct what effect the Due Process Clause has on a preventive detention scheme when two interests of such significance are involved. The Government contends that section 3142(e) is to be upheld simply because preventive detention is a rational means of advancing the compelling state interest in public safety. That cannot be the test for determining the constitutionality of preventive detention. The fallacy of using such a test can be readily seen from consideration of preventive detention as applied to persons not arrested for any offense. It cannot seriously be maintained that under our Constitution the Government could jail people not accused of any crime simply because they were thought likely to commit crimes in the future. Yet such a police state approach would undoubtedly be a rational means of advancing the compelling state interest in public safety. In a constitutional system where liberty is protected both substantively and procedurally by the limitations of the Due Process Clause, a total deprivation of liberty cannot validly be accomplished whenever doing so is a rational means of regulating to promote even a substantial governmental interest.[4]
 
 
 52
 Incarcerating dangerous persons not accused of any crime would exceed due process limits not simply for lack of procedural protections. Even if a statute provided that a person could be incarcerated for dangerousness only after a jury was persuaded that his dangerousness had been established beyond a reasonable doubt at a trial surrounded with all of the procedural guarantees applicable to determinations of guilt, the statute could not be upheld, no matter how brief the period of detention. It would be constitutionally infirm, not for lack of procedural due process, but because the total deprivation of liberty as a means of preventing future crime exceeds the substantive limitations of the Due Process Clause. This means of promoting public safety would be beyond the constitutional pale. The system of criminal justice contemplated by the Due Process Clause--indeed, by all of the criminal justice guarantees of the Bill of Rights--is a system of announcing in statutes of adequate clarity what conduct is prohibited and then invoking the penalties of the law against those who have committed crimes. The liberty protected under that system is premised on the accountability of free men and women for what they have done, not for what they may do. The Due Process Clause reflects the constitutional imperative that incarceration to protect society from criminals may be accomplished only as punishment of those convicted for past crimes and not as regulation of those feared likely to commit future crimes.
 
 
 53
 What must be determined in this case is whether incarceration for dangerousness as a regulatory measure, though generally prohibited, may be validly applied to a person who has been lawfully arrested. I think it may not. As a matter of probabilities, a person lawfully arrested may pose a greater danger than someone not arrested but only suspected of dangerousness, but is very likely less of a risk to the community than many who have been convicted, sentenced, and released from confinement after expiration of their sentences. Just as the Due Process Clause would prohibit incarcerating a person not even accused of a crime in order to prevent his future crimes, it would equally bar preventive detention of a person who has been convicted of past crimes and has served his sentence. The Clause must accord similar protection to a person not convicted but only accused of a crime. Moreover, if the arrest is thought to reflect that the person is more deserving of confinement than members of the public not accused of crime, the confinement would offend the procedural component of due process by dispensing with the procedural guarantees of the Fifth and Sixth Amendments that must be observed before past conduct may justify incarceration on grounds of dangerousness.
 
 
 54
 There can be no doubt that an arrest permits some regulatory curtailment of liberty. Even before probable cause has been found by a neutral magistrate, "a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." Gerstein v. Pugh, 420 U.S. 103, 113-14, 95 S.Ct. 854, 862-63, 43 L.Ed.2d 54 (1975). In addition, a seizure "reasonable" under the Fourth Amendment permits detention until a determination of probable cause by a judicial officer "promptly after arrest." Id. at 125.[5] Furthermore, the Constitution's scheme for a system of criminal justice specifies that arrest is to be followed by trial and plainly implies that reasonable steps may be taken to ensure that the trial will take place. Procedures may therefore be used both to secure the defendant's presence at trial and to prevent the defendant from aborting the trial by intimidating witnesses or physically harming them. The risk of flight is normally safeguarded by requiring adequate bail, see Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 1 (1951),[6] but circumstances may arise, as this case illustrates, where a reasoned determination may be made that no conditions of release will provide adequate assurance of the defendant's presence at trial. In such circumstances, pretrial detention is a valid regulatory device. See Bell v. Wolfish, supra, 441 U.S. at 534, 99 S.Ct. at 1871; United States v. Martir, supra, 782 F.2d at 1143. Pretrial detention may also be validly imposed whenever substantial evidence indicates that a defendant, if released, would intimidate or injure witnesses or jurors. See United States v. Payden, 768 F.2d 487 (2d Cir.1985); United States v. Gilbert, 425 F.2d 490 (D.C.Cir.1969) (per curiam). See also Application of Cochran, 434 F.Supp. 1207 (D.Neb.1977) (pretrial detention of material witnesses). Pretrial detention to avoid undue risks of flight or jeopardy to the trial process is not prohibited by a constitutional scheme that relies on the trial process to determine guilt and enforce the criminal law.
 
 
 55
 Pretrial detention to prevent future crimes against society at large, however, is not justified by any concern for holding a trial on the charges for which a defendant has been arrested. It is simply a means of providing protection against the risk that society's laws will be broken. Even if the highest value is accorded to that objective, it is one that may not be achieved under our constitutional system by incarcerating those thought likely to commit crimes in the future. Detention of a person lawfully arrested for past criminal conduct is unconstitutional not because preventing crime is less important than preventing a defendant's flight, but because this means of preventing crime conflicts with fundamental principles of our constitutional system of criminal justice, while detention to prevent flight serves the principles of that system by guaranteeing that the defendant will stand trial and, if convicted, face punishment.
 
 
 56
 Permitting an arrested person thought to be dangerous to remain at liberty unquestionably incurs a risk. The prediction of dangerous conduct, however difficult to make and however unreliable, will undoubtedly be correct in some instances.[7] But all guarantees of liberty entail risks, and under our Constitution those guarantees may not be abolished whenever government prefers that a risk not be taken.
 
 
 57
 The limited circumstances justifying incarceration for dangerousness serve to highlight the fundamental unlawfulness of pretrial preventive detention. Obviously dangerousness may be considered in selecting an appropriate punishment for those convicted of crime. Once a defendant has been convicted and sentenced, dangerousness may also validly be considered in deciding whether bail should be granted while the conviction is challenged on appeal. Carbo v. United States, 82 S.Ct. 662, 7 L.Ed.2d 769 (Douglas, Circuit Justice, 1962); Fernandez v. United States, 81 S.Ct. 642, 5 L.Ed.2d 683 (Harlan, Circuit Justice, 1961); United States v. Anderson, 670 F.2d 328 (D.C.Cir.1982) (per curiam); United States v. Provenzano, 605 F.2d 85 (3d Cir.1979). In this context, conviction has occurred, and dangerousness is assessed in determining whether service of the sentence must commence immediately. Even in this context significant voices have expressed doubts: "Imprisonment to protect society from predicted but unconsummated offenses is so unprecedented in this country and so fraught with danger of excesses and injustice that I am loath to resort to it, even as a discretionary judicial technique to supplement conviction of such offenses as those of which defendants stand convicted." Williamson v. United States, 184 F.2d 280, 282-83 (Jackson, Circuit Justice, 1950).
 
 
 58
 Detention to prevent dangerous conduct may also be imposed upon those who lack the capacity to be fully accountable for their own actions. The Supreme Court has upheld the constitutionality of a statute authorizing preventive detention of sexual psychopaths, deeming them to be persons unable to control their impulses. Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). See also Addington v. Texas, 441 U.S. 418, 425-27, 99 S.Ct. 1804, 1808-10, 60 L.Ed.2d 323 (1979) (civil commitment for mental illness). A similar approach, in far less aggravated circumstances, was employed in Schall v. Martin, supra, upholding New York's preventive detention law for juveniles accused of acts of delinquency. The Court observed, "Children, by definition, are not assumed to have the capacity to take care of themselves." 467 U.S. at 265, 104 S.Ct. at 2410. The defendants detained for dangerousness in this case, however, have not been convicted of the offenses charged, and they are competent adults.
 
 
 59
 I have carefully considered the opinions of other appellate courts that have upheld the constitutionality of pretrial confinement for dangerousness in the face of Fifth Amendment objections and find myself in respectful disagreement. See United States v. Portes, supra; United States v. Delker, 757 F.2d 1390 (3d Cir.1985); United States v. Edwards, supra. In Portes, the Seventh Circuit ruled that pretrial detention for dangerousness under section 3142(e) was not punishment and that the procedures specified in the Bail Reform Act satisfy the due process requirements appropriate for deprivation of liberty between arrest and trial. The opinion does not discuss the more fundamental question whether the substantive component of due process permits a person not convicted of a crime to be confined for any purpose not related to the conduct of an impending trial.
 
 
 60
 Delker also analyzed the issue solely as one of procedural due process. In the Third Circuit's view, the procedures of the Act were adequate because the interests at stake in a detention hearing were identical to those in a preliminary hearing. The same view had earlier been expressed by the District of Columbia Court of Appeals in Edwards. That equation is difficult to accept. The interest at stake in a detention hearing is liberty between arrest and trial. A preliminary hearing, on the other hand, determines whether sufficient evidence warrants a trial, leaving for consideration the issue we now confront--whether, pending that trial, the accused may constitutionally be detained for any reason not related to the conduct of the trial. To equate the purposes of a detention hearing and a preliminary hearing is to assume the very point in issue, that a person may be detained prior to trial on grounds of dangerousness. That assumption is incompatible with the Due Process Clause. Only the Edwards decision confronted the contention that preventive detention for dangerousness violates the substantive component of due process. The argument was rejected on the ground that pretrial liberty could be denied whenever a compelling governmental interest would thereby be advanced. 430 A.2d at 1341. As I have tried to demonstrate, that would not be so with respect to those not validly arrested, nor, in my view, is it a tenable argument simply because an arrest has occurred.
 
 
 61
 In only one instance in the constitutional jurisprudence of this country has the Supreme Court upheld the preventive detention of competent adults, prior to conviction of any crime. In Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), the Court approved the compulsory relocation and related detention of Americans of Japanese descent during World War II to prevent them from committing acts deemed inimical to the Nation's security, indeed its survival. If Korematsu is valid today, a proposition seriously to be questioned, see Korematsu v. United States, 584 F.Supp. 1406 (N.D.Cal.1984), it illustrates the rare, possibly unique, circumstance in which preventive detention of a competent adult in a time of national emergency comports with the requirements of due process despite the total deprivation of liberty safeguarded by the Fifth Amendment. It does not, however, justify an abandonment of the fundamental principle that detention to prevent the commission of domestic crime can constitutionally occur only after conviction.
 
 
 62
 For all of these reasons, I conclude that section 3142(e) is unconstitutional to the extent that it authorizes pretrial detention on grounds of danger to the community.
 
 Conclusion
 
 63
 Since a majority of the panel is in agreement that pretrial detention of the defendants on the ground of dangerousness is unconstitutional at least where such detention has lasted, as in this case, for more than eight months, some revision of the District Court's orders must be made. Gonzales Claudio was ordered detained by the Magistrate solely on the ground of dangerousness; the Magistrate expressly found that detention was not warranted on the ground of flight. On the defendant's appeal to the District Court, the District Judge upheld detention on the ground of dangerousness. Camacho-Negron was ordered detained by the Magistrate on grounds of both dangerousness and flight, but the District Court affirmed his detention solely on the ground of dangerousness, apparently without determining whether the Magistrate's order was supportable on the ground of flight. Now that continued detention of the defendants on the ground of dangerousness has been ruled unconstitutional, the detention orders for Gonzales Claudio and Camacho-Negron, the only defendants held solely for dangerousness, must be remanded for further consideration. On remand, the District Court should consider whether their detention is warranted on the ground of flight, an issue it has thus far not adjudicated as to those two defendants; unless the District Court determines that no conditions of release will reasonably assure their appearance as required, appropriate conditions of release should be established.
 
 
 64
 With respect to Melendez-Carrion, Fernandez-Diamante, Colon Osorio, Ojeda Rios, Castro-Ramos, and Segarra Palmer, each of whom was lawfully ordered detained on the ground of flight, the orders of detention are affirmed.
 
 
 65
 In view of the significance of the issues raised on this appeal, all members of the panel are in agreement that issuance of the mandate of this Court shall be stayed for an additional period of thirty days, beyond the period specified by Fed.R.App.P. 41(a), to permit application to the Supreme Court by any party for a writ of certiorari. See Fed.R.App.P. 41(b).
 
 
 66
 Remanded as to Gonzales Claudio and Camacho-Negron, affirmed as to all other defendants, and issuance of mandate stayed.
 
 FEINBERG, Chief Judge, concurring:
 
 67
 I concur in the analysis and conclusions in Parts II, III and IV A of Judge Newman's comprehensive opinion and that portion of part IV B which addresses the eighth amendment issue. However, I concur only in the result with regard to the continued confinement on grounds of dangerousness of appellants Gonzales Claudio and Camacho-Negron. Judge Newman's opinion rules unconstitutional on its face an important aspect of the Bail Reform Act of 1984, 18 U.S.C. Sec. 3141 et seq. (the Bail Act), and would bar the pretrial detention for even a brief period of time of a competent adult criminal defendant on the basis of danger to the community. I harbor doubts regarding that position. On the facts of this case, I also do not see the necessity of deciding such a broad question. Gonzales Claudio and Camacho-Negron were arrested in Puerto Rico on August 30 and have been detained ever since on the basis that no combination of conditions of release would reasonably assure the community's safety. The length of detention they have already endured, in addition to other factors, violates due process by inflicting punishment without an adjudication of guilt. I write separately to express this view. Detention for dangerousness for a comparatively short time not at issue here may lead to a different result, and I leave that problem for another day.
 
 I.
 
 68
 This court has never decided whether lengthy pretrial detention designed to prevent dangerous acts is consistent with the due process clause of the fifth amendment. Our decision in United States v. Colombo, 777 F.2d 96 (2d Cir.1985), recognized but did not reach the issue. In Colombo, a district judge concluded that even though Anthony Colombo presented a danger to the community pending trial, he should be released because anticipated pretrial delays would otherwise violate his due process rights. A panel of this court reversed the judgment, stating that this due process determination was premature. The panel noted that at the time of the detention hearing the length of pretrial delay remained a speculative matter, and held that "the possible length of Colombo's pretrial detention was not a proper basis" for the district judge's order. The panel concluded that Congress chose the Speedy Trial Act as the primary vehicle for limiting the length of pretrial detention under the Bail Act, see 18 U.S.C. Sec. 3164, but recognized that in complex cases the Speedy Trial Act "might not 'work perfectly well to protect against lengthy incarceration.' " The panel stated that were the issue correctly framed in such a case "the length of a defendant's pretrial detention [because of danger to the community] might not survive a proper due process challenge," but it did not reach that issue. Id. at 100-01 & n. 2.
 
 
 69
 Like Judge Newman, I take at face value the language of Colombo and conclude that the issue now before us is an open one in this circuit. The Third Circuit, relying on Colombo, agrees that "at some point due process may require a release from pretrial detention." United States v. Accetturo, 783 F.2d 382, 388 (3d Cir.1986). In Accetturo, a case involving three-and-a-half months of pretrial incarceration, the court held that due process does not require a trial judge to consider the probable length of pretrial detention as a factor in making the original decision whether to detain. The court noted the uncertainty that surrounds the scheduling of the trial at the time of the detention hearing, and reasoned that a due process challenge should await a later stage in the proceedings. Id. at 387-88. See also United States v. Portes, 786 F.2d 758, 768 (7th Cir.1986) (rejecting due process challenge as premature, while noting that "at some point, the length of delay may raise due process objections").
 
 
 70
 The parties before us disagree over when this case will come to trial. Counsel for appellants maintain that the number of defendants, the complexity of discovery, the return of a superseding indictment and the need to transcribe and translate hundreds of tapes of intercepted conversations in Spanish will make commencement of trial before mid-1987 impossible. On this view, appellants could be detained for two or three years before their guilt or innocence is determined at trial. The government disputes appellants' prediction but has not offered any estimate of a trial date. However, we need not decide when trial will begin in order to reach the merits of the due process claim. Appellants have been detained for over eight months. That is more than enough to bring the constitutional issue squarely before us. While Congress may not have foreseen such a result, the Speedy Trial Act unfortunately has not protected appellants from lengthy pretrial confinement. The Speedy Trial Act, of course, was not designed to allay due process concerns, but to effectuate the speedy trial provision of the sixth amendment. See Accetturo, supra, 783 F.2d at 394-95 (Sloviter, J., dissenting in part).
 
 
 71
 The Bail Act raises serious due process issues. The decision whether to detain a defendant before trial implicates one of the most precious interests protected by the due process clause--the defendant's interest in freedom from incarceration. The "liberty" protected by the due process clause has always included freedom from bodily restraint. Ingraham v. Wright, 430 U.S. 651, 673-74, 97 S.Ct. 1401, 1413-14, 51 L.Ed.2d 711 (1977); see also Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Appellants argue that the Bail Act accordingly deserves the strictest judicial scrutiny. The government suggests that we adopt the more relaxed standard of review articulated in Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984). That case rejected a due process challenge to New York's scheme for detaining juveniles accused of crime in order to prevent them from committing crimes while on release. The Supreme Court held the system was compatible with due process because detention on the basis of dangerousness "serve[d] a legitimate state objective" without "amounting to punishment," and the procedures established by the statute were "adequate to authorize the pretrial detention of at least some juveniles." Id. at 264, 269, 104 S.Ct. at 2410.
 
 
 72
 In Bell v. Wolfish, 441 U.S. 520, 534 n. 15, 99 S.Ct. 1861, 1871 n. 15, 60 L.Ed.2d 447 (1979), the Supreme Court had reserved the question whether any objective other than assuring a defendant's presence at trial could constitutionally justify pretrial detention. Schall settled the issue in the juvenile context by holding that the concern for sheltering the juvenile from the consequences of future crimes, when combined with the "legitimate and compelling" interest in protecting the community from those crimes, may justify pretrial incarceration. Id. at 264-68, 104 S.Ct. at 2410-12. Along similar lines, the Bail Act provides for detention on the basis of dangerousness for the purpose of reducing what Congress saw as the "growing problem" of crimes committed by defendants released on bail. S.Rep. No. 225, 98th Cong., 2d Sess. 6 (1983), reprinted in 1984 U.S.Code Cong. & Ad.News at 3188-89 (Senate Report). I assume without deciding that this goal is also sufficiently legitimate and compelling to justify the detention of adult defendants for at least a relatively short period of time, cf. United States v. Freitas, 602 F.Supp. 1283, 1287-88 (N.D.Cal.1985), although the Bail Act, unlike the juvenile statute at issue in Schall, does not seek to protect defendants from the consequences of their own actions.
 
 
 73
 However, under the due process clause a defendant may not be punished prior to a formal adjudication of guilt. Bell v. Wolfish, supra, 441 U.S. at 535-36, 99 S.Ct. at 1871-72; Wong Wing v. United States, 163 U.S. 228, 235, 237, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896). Persons who are detained under the Bail Act have not received the benefit of a trial and its attendant fifth and sixth amendment safeguards. Pretrial detention thus must not degenerate into punishment, regardless of the reasons the government invokes to justify it. Schall v. Martin, supra, 467 U.S. at 269, 104 S.Ct. at 2412-13. Nevertheless, determining whether the Bail Act imposes punishment is not simple. Whether a sanction constitutes a punitive or merely a regulatory measure depends, first of all, on whether it is imposed for the purpose of punishment. Id.; Bell v. Wolfish, supra, 441 U.S. at 538, 99 S.Ct. at 1873. Absent such an intent to punish, it becomes necessary to assess other factors.
 
 
 74
 Turning to the question of intent, the legislative history suggests that Congress did not intend to use the Bail Act to punish defendants suspected of being dangerous to the community. Congress indicated that pretrial detention for dangerousness was not intended to advance the traditional penal aims of retribution and deterrence, see Bell v. Wolfish, supra, 441 U.S. at 538, 99 S.Ct. at 1873, but rather to curb future conduct. Senate Report at 8, reprinted in 1984 U.S.Code Cong. & Ad.News at 3191. In defining these statutory goals, Congress relied on the analysis in United States v. Edwards, 430 A.2d 1321 (D.C.App.1981) (in banc), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982), which upheld against constitutional attack the preventive detention scheme of the D.C. bail statute, in part on the basis that Congress had not enacted it for punitive purposes. Therefore, like Judge Newman, I am willing to assume that Congress' motives for preventive detention under the Bail Act were not punitive either. See Portes, supra, 786 F.2d at 767; United States v. Freitas, supra, 602 F.Supp. at 1291.
 
 
 75
 Nevertheless, a conclusion that Congress' purposes were regulatory does not resolve whether the incarceration of defendants for over eight months founded on the threat they pose to the community imposes punishment. Under Schall and Bell v. Wolfish, it also is necessary to examine the more objective aspects of the sanction: preventive detention must not be excessive in relation to the nonpunitive aims assigned to it. Schall v. Martin, supra, 467 U.S. at 269, 104 S.Ct. at 2413, Bell v. Wolfish, supra, 441 U.S. at 538-39, 99 S.Ct. at 1873-74. In the latter case, the Supreme Court noted several "tests traditionally applied to determine whether a governmental act is punitive in nature," including
 
 
 76
 [W]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment--retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in different directions.
 
 
 77
 441 U.S. at 537-38, 99 S.Ct. at 1873 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 567-68, 9 L.Ed.2d 644 (1963)). In applying the factors just enumerated the government maintains that detention, if regulatory at the start, remains regulatory in nature no matter how long a person is detained and that the length of detention is irrelevant. I disagree with this view. I believe that lengthy delay can transform what might otherwise be a valid regulatory measure into one that is punitive regardless of Congress' stated intentions. See Portes, supra, at 768; Accetturo, supra, 783 F.2d at 388; Colombo, supra, 777 F.2d at 100-01.
 
 
 78
 In this case, key objective factors point to the conclusion that the "operation" of the Bail Act, as applied to Gonzales Claudio and Camacho-Negron, has become punishment. Incarceration under the Bail Act certainly entails significant "affirmative restraints" on bodily movement, travel, association with others and hosts of other freedoms. The stakes are much higher, and the disability much more severe, than those involved in juvenile detention systems such as the one considered in Schall. The special status of juveniles, who are always in the custody either of their parents or of the state in its role as parens patriae, limits their interest in freedom from confinement. Schall, supra, 467 U.S. at 265, 104 S.Ct. at 2410. By contrast, mentally competent adults subject to the Bail Act enjoy the fullest degree of legal protection from government attempts to limit their freedom. The extraordinarily long period of detention at issue here highlights another critical difference between the Bail Act, which does not specify how long a defendant may be held before trial, and the statutes evaluated in Schall and Edwards, which placed stringent time limits on such detention. The former limited pretrial confinement to a period that generally did not exceed seventeen days,[1] the latter to sixty.
 
 
 79
 Most persuasively of all, under the Bell v. Wolfish analysis, incarceration for periods of as long as eight months has "historically been regarded as punishment," see Flemming v. Nestor, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960). Indeed, the Tenth Circuit recently held that detention of four months before trial constitutes impermissible punishment. United States v. Theron, 782 F.2d 1510, 1516 (10th Cir.1986). Although, for reasons noted below, I disagree with Theron's precise holding that such detention may not be imposed to prevent flight before trial, the case certainly indicates that the incarceration at issue here is rendered so harsh by its length that it, too, degenerates into punishment. See also United States v. LoFranco, 620 F.Supp. 1324 (N.D.N.Y.) (six-month detention), stay denied, 620 F.Supp. 1327 (1985), appeal dismissed sub nom. United States v. Cheeseman, 783 F.2d 38 (2d Cir.1986). Enforced separation from family, friends and the community by confinement in an institutional setting for many months is clearly punitive under our traditions. No one could persuasively contend that restricting a man or woman to a cellblock for five years without a trial has not historically been seen as punishment. That is an extreme case, and I do not suggest that the due process clause necessarily establishes a bright line regulating all periods of pretrial detention. See Theron, supra, 782 F.2d at 1516-17; Accetturo, supra, 783 F.2d at 388; cf. Edwards, supra, 430 A.2d at 1332 (pretrial detention for 60 days on ground of dangerousness poses "particularly close" due process question). But I am convinced that the general requirements of due process compel us to draw that line at some point well short of the eight months involved here.
 
 
 80
 Even though detention as lengthy as that involved here generally has been considered punishment which must be preceded by a trial, there are several limited traditional exceptions to this view. One exception concerns the time a defendant spends in custody between arrest and arraignment; such custody has customarily been seen as regulatory rather than punitive. See Gerstein v. Pugh, 420 U.S. 103, 113-14, 95 S.Ct. 854, 862-63, 43 L.Ed.2d 54 (1975). Another exception embraces the civil commitment of mentally ill persons unable to take care of themselves, cf. Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). Yet another concerns the state's assumption of physical control over juveniles in its parens patriae capacity without benefit of a trial, a practice so widely and traditionally recognized that all 50 states provide by statute for preventive detention of juveniles. Schall v. Martin, supra, 467 U.S. at 266-68 & n. 16, 104 S.Ct. at 2410-11 & n. 16.
 
 
 81
 Finally, pretrial detention has "historically" not been seen as punishment when designed to protect the integrity of the judicial process by assuring the defendant's appearance or preventing his interference with witnesses. See Edwards, supra, 430 A.2d at 1332; see also Stack v. Boyle, 342 U.S. 1, 4-5, 76 S.Ct. 1, 4, 96 L.Ed. 1 (1951) (bail may be set at amount needed to prevent flight). The practice of denying bail for such reasons is well-established. See, e.g., United States v. Martir, 782 F.2d 1141, 1143 (2d Cir.1986); United States v. Affleck, 765 F.2d 944, 956-57 (10th Cir.1985) (in banc) (McKay, J., dissenting); United States v. Jessup, 757 F.2d 378, 387 (1st Cir.1985); see also Bell v. Wolfish, supra, 441 U.S. at 523, 99 S.Ct. at 1865 (parties' concession that pretrial detention to prevent flight is legitimate). The longstanding practice of denying bail in capital cases belongs to this exception as well, since bail was denied to prevent flight in such cases. Edwards, supra, 430 A.2d at 1326 n. 6.
 
 
 82
 But here, Gonzales Claudio and Camacho-Negron face continued incarceration solely on the basis of their anticipated propensity to commit future crimes, a reason falling outside any of these established exceptions. Rather, as Judge Newman's scholarly historical survey shows, detention for dangerousness breaks radically with our bail traditions. Accordingly, the restraint the Bail Act has already placed on the defendants held for dangerousness would historically be viewed as punitive. For that reason, as well as the serious affirmative restraint imposed by their incarceration, their detention on the ground of dangerousness has degenerated into punishment prior to an adjudication of guilt.
 
 II.
 
 83
 The remaining appellants held to prevent flight before trial stand in a different position under the due process clause. As noted above, detention for such purposes has never been characterized as punishment. Under the tests of Bell v. Wolfish and Mendoza-Martinez quoted above, I agree with Judge Newman that detention for that reason comports with due process in this case. While due process may eventually impose a limit on the period of time a defendant may be held to protect the integrity of the judicial process, I do not believe that such a point has been reached here. I note, however, that at least one appellate court has already ruled that incarceration for even such a traditional purpose for four months violates the constitution, see Theron, supra.
 
 
 84
 For these reasons, on the facts of this case, I concur in the conclusion that due process bars further detention of Gonzales Claudio and Camacho-Negron on the ground of dangerousness and agree with the remand directions as to these appellants.
 
 TIMBERS, Senior Circuit Judge, dissenting:
 
 85
 Nearly eight years ago we had the occasion to state that "[t]errorism, both domestic and international, is one of the gravest problems of our day."[1] It still is. Events, of which we are all aware, even since the argument of this appeal and continuing to the date of the filing of our opinions in this case, make it increasingly clear that organized terrorism, like organized crime, is not about to go away. It calls for protective measures with a severity proportionate to the danger at hand.
 
 
 86
 The essential question presented on this appeal is whether the United States is powerless to protect the public from the depredations of appellants who are key members of Los Macheteros, one of the most notorious terrorist organizations in the western hemisphere, based in Puerto Rico. I believe that the United States is not powerless to provide the needed protection. One critical aspect of such protection has been provided by Congress in the Bail Reform Act of 1984--specifically in permitting pretrial detention of those defendants found to constitute a danger to the community.
 
 
 87
 I regret that I am unable to join in the thoughtful, scholarly, innovative opinions of Judge Newman and Chief Judge Feinberg. I am unable to do so simply because I disagree with their views that result in eliminating pretrial detention for dangerousness as an option available to courts, where, as here, an experienced magistrate and an experienced district judge have found that the defendants constitute a danger to the community. In so doing, Judge Newman and Judge Feinberg, in a case of first impression, have struck down as unconstitutional, on its face and as applied, a key provision of the Bail Reform Act.
 
 
 88
 I therefore dissent most emphatically from my colleagues' separate views that the Fifth Amendment right to due process of law was violated in the cases of those appellants who are being detained pending trial on the ground that they constitute a danger to the community. Judge Newman and Judge Feinberg both recognize the government interest in preserving the integrity of the trial process and the interest in protecting the community from defendants who have been charged with very serious crimes and who are shown to be likely to commit additional crimes if they are released pending trial. I disagree, however, with the significantly greater weight my colleagues accord to preserving the integrity of the trial process and preventing risk of flight, compared with protecting the community from those who have been found to constitute a danger to the community. My colleagues do not give sufficient weight to the intent of Congress in enacting the Bail Reform Act and to the care exercised by Congress in establishing procedural requirements which prevent unjustified infringement upon the liberty interests at stake.[2]
 
 I.
 
 89
 The effect of my colleagues' view that these defendants cannot be detained prior to trial on grounds of dangerousness is effectively to emasculate the heart of the Bail Reform Act. Congress intended the Act to apply to this type of case involving very serious offenses and involving defendants whose predictable future criminal conduct cannot be held in check by imposing conditions on pretrial release. In order to place the Fifth Amendment issue in proper perspective, it may be helpful to describe the activities of those two appellants who, under my colleagues' view, would be released pending trial--despite the detailed findings of the magistrate and the district court that they should be detained.
 
 Camacho-Negron
 
 90
 The magistrate and the district court enumerated the following reasons for detaining Camacho-Negron. He was a salaried member of Los Macheteros, the terrorist organization involved in sophisticated para-military activities. He had been "approved" for military action, operated under a code-name, and participated in the January 1981 attack on the Muniz Air Base in Puerto Rico where nine aircraft were destroyed. Los Macheteros claimed credit for this attack as well as other terrorist acts involving murder, robbery, and destruction of property. Camacho-Negron had financial dealings with other members of the organization. Evidence tied him to the transportation of the Wells Fargo armed robbery proceeds from upstate New York to Mexico. He had a pistol at the time of his arrest and was equipped to travel to foreign countries.Gonzales-Claudio
 
 
 91
 Gonzales-Claudio had been a longtime member of Los Macheteros. He had a salaried position in the organization, was entrusted with weaponry, and used a code-name. Evidence linked him to the December 1979 attack on a Navy bus in which two sailors were killed and nine others wounded, and to the January 1981 attack on the Muniz Air Base. He was involved in smuggling explosives into Puerto Rico from Mexico, and in transporting Wells Fargo armed robbery proceeds from the United States to Mexico. He flaunted the Wells Fargo armed robbery by participating in the gift give-away program and in contacting the press. At the time of his arrest, he resisted and the agents uncovered a pistol. He had an "ability and willingness to use violence against innocent persons" according to the magistrate and the district court.
 
 
 92
 Both appellants are members of a well-organized terrorist group that has a network available for safe-houses, weapons storage and travel. I agree that the district court on remand should consider whether these two appellants who were found to pose a danger to the community also pose a risk of flight.
 
 II.
 
 93
 I do not agree with my colleagues that the Fifth Amendment prohibits the pretrial detention of the two appellants who are being detained only on the ground of danger to the community (Camacho-Negron and Gonzales-Claudio). I shall first address Judge Newman's view that even a short period of detention in such a case violates the due process clause of the Fifth Amendment. I shall then turn to Judge Feinberg's view that the length of detention in this case results in punishment before an adjudication of guilt, in violation of the due process clause.[3]
 
 
 94
 (A)
 
 
 95
 Judge Newman would hold as unconstitutional under the due process clause of the Fifth Amendment even a brief period of pretrial detention based on a defendant's danger to the community. I do not agree that such detention fails to comport with the Fifth Amendment concept of fundamental fairness. In my view, the constitutional parameters set forth by the Supreme Court, the legislative history of the Bail Reform Act, and the procedural safeguards provided by the Act permit pretrial detention where a defendant poses a serious risk to the safety of the community.
 
 
 96
 Bell v. Wolfish, 441 U.S. 520, 534 n. 15 (1979), left open the question whether a government objective other than ensuring a defendant's presence at trial may justify pretrial detention under the due process clause. Since then, the detention authorized by the New York Family Court Act of juveniles likely to commit crimes was upheld in Schall v. Martin, 467 U.S. 253 (1984). As my colleagues point out, the Supreme Court in Schall recognized the state's role as parens patriae and the seventeen-day detention limitation in that decision. But in analyzing the substantive component of due process--whether the legislation is compatible with fundamental fairness--the Schall Court first questioned whether the statute "serve[s] a legitimate state objective" and, second, whether the procedural safeguards are adequate. 467 U.S. at 263-64. The Court then stated:
 
 
 97
 " 'A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.' Absent a showing of an express intent to punish on the part of the State, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' "
 
 
 98
 467 U.S. at 269 (quoting Bell v. Wolfish, 441 U.S. 520, 538 (1979); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963)). Whether we analyze the interest of the government under a "legitimate" purpose test or under a "weighty public interest" test, see Schall, supra, 467 U.S. at 291 (Marshall, J., dissenting), I believe that the government has sustained its burden in the instant case. The government has a "legitimate and compelling interest" in protecting the community from crime. Schall, supra, 467 U.S. at 264 (quoting De Veau v. Braisted, 363 U.S. 144, 155 (1960)).
 
 
 99
 When Congress enacted the Bail Reform Act, it responded conscientiously to the disturbing rate of recidivism among released defendants[4] and the need to give as much consideration to the danger a defendant may pose in the pretrial release determination "as the likelihood that he will not appear for trial." S.Rep. No. 225, 98th Cong., 2d Sess. 6, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3189. Congress also recognized that the prior law of bail resulted in disparate treatment among defendants based on ability to post bond. In discussing pretrial release determinations prior to the 1984 Act, the Committee observed:
 
 
 100
 "If a court believes that a defendant poses such a [grave] danger, it faces a dilemma--either it can release the defendant prior to trial despite these fears, or it can find a reason, such as risk of flight, to detain the defendant (usually by imposing a high money bond). In the Committee's view, it is intolerable that the law denies the judges the tools to make honest and appropriate decisions regarding the release of such defendants."
 
 
 101
 S.Rep. No. 225, 98th Cong., 2d Sess. 5, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3188. In my view, removing from a court's options the right to detain based on dangerousness only invites a court to detain a dangerous person on the ground of risk of flight. Unlike the "clear and convincing" evidence standard applied in detaining a person on the ground of dangerousness, the government need establish a risk of flight by only a preponderance of the evidence. Congress clearly intended that judicial officers should consider separately whether an individual is a danger to the community or whether he poses a risk of flight. Judge Newman's proposed holding, I fear, would resurrect the very predicament which Congress attempted to halt.
 
 
 102
 In view of the strong interest in preventing reasonably predictable criminal activity by defendants charged with serious crimes, and the non-punitive nature of the detention, the remaining issue is whether the procedures afforded the detainees provide sufficient protection against erroneous and unnecessary deprivations of liberty. See Schall, supra, 467 U.S. at 274 Mathews v. Eldridge, 424 U.S. 319, 335 (1976).
 
 
 103
 The Bail Reform Act provides significant mechanisms and protections against unjustified restraints. The statute is far more specific than the juvenile detention statute addressed in Schall. Detention under the Act does not apply to all defendants charged with serious crimes. Rather, the Act is intended to apply to "a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial." S.Rep. No. 225, 98th Cong., 2d Sess. 6-7, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3189. The judicial officer must be convinced that conditions on release are not adequate. A hearing on this issue must be held. 18 U.S.C. Sec. 3142(e), (f). Of course, probable cause to believe that the accused committed the crime must be established. Gerstein v. Pugh, 420 U.S. 103, 114 (1975); Morrissey v. Brewer, 408 U.S. 471, 489 (1972). The determination that no conditions of release will protect adequately the public must be supported by clear and convincing evidence, 18 U.S.C. Sec. 3142(f), whereas risk of flight need only be shown by a preponderance of evidence. This is not an ad hoc determination. The judicial officer must consider the factors set forth in Sec. 3142(g), including the seriousness of the charge and its violent nature, the weight of the evidence, the history and characteristics of the accused, and the nature and seriousness of the danger posed to the community. There must be an evidentiary basis for the facts supporting a judicial officer's conclusion that pretrial detention is necessary. Moreover, the defendant at a detention hearing has the right to counsel or appointed counsel if he cannot afford an attorney, the right to present witnesses on his behalf, the right to cross-examine witnesses and the right to present information by proffer or otherwise. 18 U.S.C. Sec. 3142(f). In addition, subsection (i) reinforces the deliberation requirement imposed on the judicial officer and aids the process of appellate review. The detention order must include written findings of fact and the specific reasons for detention. As further protections against restraints on liberty, the statute requires that, to the extent possible, pretrial detainees must be separated from those persons who are serving their sentences after conviction. A detainee also must be afforded a reasonable opportunity to consult with counsel. Finally, a detainee is entitled to prompt appellate review of a detention order. 18 U.S.C. Sec. 3145(b).[5]
 
 
 104
 These effective procedural safeguards, combined with the strong government interest at stake, in my view, support the constitutionality of pretrial detention based on a defendant's proven danger to the community.
 
 
 105
 (B)
 
 
 106
 I also disagree with Judge Feinberg's view that the length of detention in this case violates the due process rights of those appellants being held on the ground of danger to the community.
 
 
 107
 Not only must pretrial detention serve a legitimate government interest to satisfy due process--a burden which I believe the government has sustained--but it is clear that there can be no punishment prior to an adjudication of guilt. Bell v. Wolfish, supra, 441 U.S. at 535. Restraints on liberty are not necessarily punitive. In my view, the restraints imposed here are required by the extraordinary need to protect the public from especially dangerous individuals. The Bail Reform Act on its face states no intent to punish pretrial detainees. The legislative history of the Act is devoid of any intention to punish. Congress did not seek to foster traditional goals of punishment such as retribution, deterrence, or rehabilitation. Congress' sole concern was the safety of the community. Pretrial detention does not punish past conduct but rather protects the community from predictable future conduct. United States v. Edwards, 430 A.2d 1321, 1332 (D.C.App.1981) (en banc), cert. denied, 455 U.S. 1002 (1982); United States v. Hazzard, 598 F.Supp. 1442, 1451 (N.D.Ill.1984). Congress carefully incorporated the analysis of Edwards in the Bail Reform Act. The nonpunitive intent is further illustrated by Congress' mandate that pretrial detainees, to the extent possible, be separated from those persons who are serving sentences after a conviction. 18 U.S.C. Sec. 3142(i)(2). I agree with those courts which have held that such pretrial detention based on dangerousness is not punishment. See, e.g., United States v. Portes, 786 F.2d 758, 767 (7 Cir.1986); United States v. Maull, 773 F.2d 1479, 1485 (8 Cir.1985); United States v. Kouyoumdjian, 601 F.Supp. 1506, 1511 (C.D.Cal.1985); United States v. Hazzard, supra, 598 F.Supp. at 1451.
 
 
 108
 I also disagree with Judge Feinberg's view that passage of time alone transforms what initially was regulatory detention into punishment, resulting in a due process violation. See also United States v. Colombo, 777 F.2d 96, 101 (2 Cir.1985) (at some point, the length of detention "might" violate due process).[6] While Judge Feinberg applies the specific factors set forth in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963), more recently the Supreme Court in Schall focused on whether there was an express intent to punish, whether an alternative purpose could rationally be assignable to the restraint on liberty, and whether it is excessive. Schall, supra, 467 U.S. at 269. Congressional intent and the importance of preventing reasonably predictable future criminal conduct[7] do not change with the passage of time. Although the length of the restraint on liberty increases with time, the form and motivation for restraint do not change with passage of time. No alternative purpose comes into play.
 
 
 109
 A determination of the constitutionality of pretrial detention based on dangerousness, moreover, should not be determined only on the basis of time as it affects the due process prohibition against punishment before an adjudication of guilt. The protections against unnecessary infringements on liberty also must include an examination of the Speedy Trial Act, 18 U.S.C. Secs. 3161-3174, and the Sixth Amendment right to a speedy trial. Delays in bringing a defendant to trial may be the result of a variety of factors. The reasons for the delay must be examined. It does not seem logical to me that a defendant whose perhaps unnecessary pretrial motions result in excludable time under the Speedy Trial Act, see 18 U.S.C. Secs. 3164, 3161(h), can transform regulatory detention into punishment and therefore demand his own release. It may be that either the defendant, or the government, or both, has increased the length of time before trial. An analysis of the validity of the detention should consider whether the defendant has moved for a severance or an expedited trial, Colombo, supra, 777 F.2d at 101, the extent of and necessity for pretrial motions made on behalf of the government and the defendant, and whether one side's strategy has added needlessly to the complexity of the case. United States v. Accetturo, 783 F.2d 382, 388 (3 Cir.1986).
 
 
 110
 While a defendant cannot be detained indefinitely prior to an adjudication of guilt, the Supreme Court has recognized that due process necessarily is a flexible concept. Gerstein v. Pugh, supra, 420 U.S. at 123, 95 S.Ct. at 867. And Congress intended to incorporate this flexibility in the Bail Reform Act by requiring judicial officers to analyze the lawfulness of pretrial detention on a case by case basis. S.Rep. No. 225, 98th Cong., 2d Sess. 19, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3201-02. An appropriate analysis therefore must include such factors as the seriousness of the crime with which the defendant is charged, the strength of the government's proof as to the individual's danger to the community, and the strength of the government's case on the merits. A judicial officer must have the tools to detain a defendant who, for one reason or another, may not pose a risk of flight, but who is so likely to commit crimes if released that no conditions imposed on release are adequate to protect the safety of the community. As Judge Feinberg states, Congress may not have envisioned the length of time a defendant could be detained pending trial when it analyzed the interrelationship between the Speedy Trial Act and the Bail Reform Act. Nevertheless, that does not relieve the courts of the duty to monitor closely motions for extensions and excludable time.
 
 III.
 To summarize:
 
 111
 I would uphold pretrial detention on the ground of a defendant's reasonably predictable danger to the community in the case where no conditions of release can protect the public adequately. The government interest in protecting the community is compelling. The carefully drafted procedural requirements in the Bail Reform Act militate against unjustified encroachment on the liberty interests at stake. Further, Congress expressed no intent in the Bail Reform Act to punish past behavior. I do not agree that passage of time alone transforms regulatory detention into punishment. In my view, an analysis of the lawfulness of pretrial detention necessarily must include an examination of the Sixth Amendment right to a speedy trial, the Speedy Trial Act, and the reasons for delay. The reasonably predictable danger a detainee poses to the community surely does not decrease with time. Efforts should be directed at bringing such a defendant to trial and monitoring closely the reasons for delay.
 
 
 112
 I would affirm the district court's detention orders of appellants Camacho-Negron and Gonzales-Claudio on the ground of their danger to the community and the ineffectiveness of conditions imposed on release. From the refusal of Judges Newman and Feinberg--in their separate opinions--to do so, I respectfully but emphatically dissent.
 
 
 
 [1]
 The New York statute appears to permit detention in excess of seventeen days by authorizing successive motions to adjourn fact-finding hearings, though only under "special circumstances." N.Y.Fam.Ct. Act Sec. 340.1(5) (McKinney 1983)
 
 
 [2]
 Section 3142(i)(2) provides that defendants in pretrial detention will be separated from sentenced prisoners "to the extent practicable," a standard that inevitably will permit confinement of pretrial detainees with sentenced prisoners in some circumstances
 
 
 [3]
 See also Trop v. Dulles 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), in which the loss of citizenship as a consequence of wartime desertion was viewed as having the penal effect of deterring desertion, id. at 97, 78 S.Ct. at 596 (Warren, C.J., plurality opinion), and the regulatory effect of promoting troop morale and efficiency, id. at 122, 78 S.Ct. at 609 (Frankfurter, J., dissenting)
 
 
 [4]
 The Government cites Bell v. Wolfish, supra, 441 U.S. at 533-34, 99 S.Ct. at 1870-71, and United States v. Payden, 768 F.2d 487, 490 (2d Cir.1985), for the proposition that pretrial detention does not violate due process as long as the detention serves any legitimate governmental interest. However, Wolfish was concerned only with the conditions of confinement, not the justification for the confinement itself. As the Court made clear, there was no dispute that the Government has "a substantial interest in ensuring that persons accused of crimes are available for trials...." 441 U.S. at 534, 99 S.Ct. at 1871. Moreover, the Court expressly reserved the question whether "any other governmental objectives may constitutionally justify pretrial detention." Id. at 534 n. 15, 99 S.Ct. at 1871 n. 15. Payden also cannot support as broad a proposition as the Government claims. That decision recognized only the power of courts to order pretrial confinement where release of the defendant poses a serious threat to the court's processes. It does not purport to allow such confinement to advance every legitimate government interest
 
 
 [5]
 A footnote in Gerstein v. Pugh, supra, states, "The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, including the detention of suspects pending trial." 420 U.S. at 125 n. 27, 95 S.Ct. at 869 n. 27. I do not believe that the last phrase of the quoted sentence was intended to make all issues concerning the lawfulness of pretrial detention referable to the standards of the Fourth Amendment. The Supreme Court's recent consideration of pretrial detention of juveniles focused on the Due Process Clause of the Fifth and Fourteenth Amendments. The Court noted that some of the same concerns that arose in Gerstein under the Fourth Amendment were present "in this context," citing to a case decided under the Due Process Clause of the Fourteenth Amendment, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Schall v. Martin, supra, 467 U.S. at 275, 104 S.Ct. at 2416. The Gerstein footnote concerns the procedural requirements for making the probable cause determination that will permit holding a defendant for consideration of release on bail. Nothing in the footnote or the text of the opinion purports to decide what substantive limitations the Due Process Clause imposes on the allowable grounds for pretrial detention without bail
 
 
 [6]
 "Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant." Stack v. Boyle, supra, 342 U.S. at 5, 72 S.Ct. at 4
 
 
 [7]
 Of course, the worth of pretrial preventive detention cannot be determined only by estimating the number of detained defendants who would have committed crimes if released on bail; consideration must also be given to the number of detained defendants who would not have committed any crimes if released and who are acquitted of the charges for which they were arrested
 
 
 [1]
 The possible, though not usual, extension of the period is referred to in Judge Newman's opinion, supra, at n. 1
 
 
 [1]
 United States v. Busic, 592 F.2d 13, 37 (2 Cir.1978) (concurring opinion)
 
 
 [2]
 This dissent is confined to my disagreement with Judge Newman and Judge Feinberg in holding that the Fifth Amendment due process rights of appellants Camacho-Negron and Gonzales-Claudio were violated. There is no dispute with respect to the other six appellants. I concur in the judgment of the Court affirming their detention orders
 I also agree with my colleagues' rejection of appellants' procedural challenges to the application of the Bail Reform Act and with my colleagues' view that the Eighth Amendment right to bail provision is not determinative of the critical issue on this appeal.
 
 
 [3]
 As must be evident, neither the view of Judge Newman nor that of Judge Feinberg, as summarized in this paragraph, represents a majority view. Each stands alone, unsupported by each other, and of course unsupported by the author of this dissenting opinion. This unfortunately will present a dilemma to district judges who will not know what the law of the Circuit is--until the Supreme Court is able to speak to the issues
 
 
 [4]
 Congress reported that "[i]n a recent study of release practices in eight jurisdictions, approximately one out of every six defendants in the sample study were rearrested during the pretrial period--one-third of these defendants were rearrested more than once, and some were rearrested as many as four times." S.Rep. No. 225, 98th Cong., 2d Sess. 6, reprinted in 1984 U.S. Code Cong. & Ad.News 3182, 3189 & n. 15 (citing Lazar Institute, Pretrial Release: An Evaluation of Defendant Outcomes and Program Impact 48 (Wash.D.C. Aug. 1981))
 
 
 [5]
 These procedural safeguards, including an individual determination of probable cause to believe the defendant has committed a serious crime, an individual detention hearing, the right to counsel, the right to present evidence, the right to cross-examine witnesses, and the burden of "clear and convincing evidence" imposed on the government, were not present in the case of the internment of the Japanese-Americans during World War II. Judge Newman's allusion to Korematsu v. United States, 323 U.S. 214 (1944), fails to recognize these significant distinctions. While Korematsu indeed may be a regrettable blemish in the history of American jurisprudence, obviously the form of detention authorized under the Bail Reform Act, with its attendant procedural protections, is not such a departure from American ideals of individual liberty
 
 
 [6]
 I think it is significant to note that in Colombo, at the time of argument, appellant had been detained on the ground of danger to the community for seven months--nearly the same time as appellants Camacho-Negron and Gonzales-Claudio have been detained on the same ground in the instant case. And yet the Colombo court declined to reach the constitutional question regarding the length of Colombo's detention because "at the time of oral argument, Colombo had not availed himself of the opportunity to move to expedite his trial or for a severance." United States v. Colombo, supra, 777 F.2d at 101. For aught that appears in the record before us in the instant case, none of appellants being detained on the ground of danger to the community has moved to expedite the trial or for a severance
 
 
 [7]
 The Schall Court recognized the ability of a judicial officer to make a reasonable prediction of future criminal conduct:
 "Our cases indicate, however, that from a legal point of view there is nothing inherently unattainable about a prediction of future criminal conduct. Such a judgment forms an important element in many decisions, and we have specifically rejected the contention, based on the same sort of sociological data ... that it is impossible to predict future behavior and that the question is so vague as to be meaningless."
 467 U.S. at 278-79 (footnote omitted; citations omitted).