UNITED STATES of America,

v.

John GOTTI, et al., Defendants.

No. 85 CR 178.

United States District Court,
E.D. New York.

May 13, 1986.

Reena Raggi, U.S. Atty. (Diane F. Giacalone, John Gleeson, Asst. U.S. Attys., of counsel), Brooklyn, N.Y., for U.S.

Slotnick & Cutler (Bruce Cutler, of counsel), New York City, for defendant John Gotti.

Slotnick & Cutler (Barry I. Slotnick, of counsel), Michael Shapiro, New York City, for defendant John Carneglia.

Hoffman, Pollok & Gasthalter (Jeffrey C. Hoffman, of counsel), New York City, for defendant Eugene Gotti.

Richard A. Rehbock, New York City, for defendant Wilfred Johnson.

David DePetris, New York City, for defendant Anthony Rampino.

Michael L. Santangelo, Susan Kellman, New York City, for defendant Leonard DiMaria.

Edward Panzer, New York City, for defendant Nicholas Corozzo.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

The indictment in this case names ten defendants. One died; another pled guilty and then fled before sentence; and a third, never arraigned, is also a fugitive. Five of the remaining seven, namely, John Gotti, John Carneglia, Eugene Gotti, Anthony Rampino, and Nicholas Corrozzo, were released on bail. The government now seeks to revoke the bail of the two Gotti's and Carneglia and to change the conditions of Rampino's release.

The indictment has two counts. The first charges that defendants, comprising the leadership of a part of the "Gambino Crime Family," and constituting an "enterprise" within the meaning of 18 U.S.C. § 1961(4), conspired, in violation of 18 U.S.C. § 1962(d), to associate together in the enterprise and to conduct the affairs of the enterprise through "a pattern of racketeering activity" consisting of theft, the conduct of illegal gambling business, extortion, robbery, trafficking in contraband cigarettes, and acts and threats involving murder and robbery.

The second count charges that defendants, in violation of 18 U.S.C. § 1962(c), conducted the affairs of the enterprise through a "pattern of racketeering activity." The count alleges fifteen racketeering acts, in at least two of which each defendant participated.

By memorandum and order dated January 3, 1986, 625 F.Supp. 1387, this court denied, except to the extent stated, defendants' motions prior to trial. Familiarity with that memorandum and order is assumed. The court then held hearings to determine, among other things, the extent to which alleged co-conspirator statements of defendant Wilfred Johnson and of one William Battista were inadmissible at trial on the ground that both had been informants for the Federal Bureau of Investigation (FBI). By memorandum and order dated March 31, 1986 the court ruled that their activities as informants did not require the court to suppress such of their

statements as were otherwise admissible under the Federal Rules of Evidence.

On April 7, 1986 the court commenced the process of jury selection. By order dated April 28, 1986 the court suspended that process and set August 18, 1986 as the date for recommencement of jury selection. The government then moved to revoke the release of John and Eugene Gotti, Carneglia, and Rampino. The court held hearings on the motion. After the hearings the government withdrew the application to detain Rampino but asked to have his conditions of release changed.

On the government's recommendation the court had released on bail on March 28, 1985 the two Gotti's and Carneglia, each on a $1,000,000 personal recognizance bond secured by certain property, and Rampino on a $500,000 personal recognizance bond secured by a surety bond.

Each of the bonds included, as required by 18 U.S.C. § 3142(c)(1), a condition that the defendant "not commit a Federal, State, or local crime during the period of release." Under 18 U.S.C. § 3148(a) a person who has violated a condition of his release is subject, among other things, to its revocation and an order of detention. By the relevant terms of 18 U.S.C. § 3148(b) the court "shall" order revocation and detention if, after a hearing, the court finds there is "probable cause to believe the person has committed a Federal, State or local crime while on release" and finds there are no conditions that will assure that he will not "pose a danger to the safety of any other person or the community" or that he is unlikely to abide by such conditions. The subsection also provides, in pertinent part, that if there is "probable cause" to believe that while on release the person has committed a felony, a "rebuttable presumption" arises that no condition will assure he will not pose such a danger.

The Senate Report, explaining the purpose of this presumption, states that because the commission of a serious crime by a released person is "plainly indicative" of his inability to abide by the law and of the danger he poses to other persons and the community, the commission of a felony during release "generally" should result in revocation of release. S.Rep. No. 225, 98th Cong., 1st Sess. 37–39, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3220–22.

In addition, 18 U.S.C. § 3142(c) provides that the court "may at any time amend [its] order to impose additional or different conditions of release." At least one court has interpreted this subsection to permit the court to revoke bail and order detention where the acts showing dangerousness occurred after the defendant's first appearance before a judicial officer. *United States v. Resek*, 602 F.Supp. 1126, 1129–30 (S.D.N.Y.1985) (Keenan, J.).

█ Aside from these statutory provisions, the court has inherent power to impose pretrial detention whenever substantial evidence indicates that a released defendant would improperly influence, intimidate or injure witnesses or jurors. *United States v. Melendez-Carrion*, 790 F.2d 984, 1002–03, (2d Cir.1986); *United States v. Payden*, 768 F.2d 487, 490 (2d Cir.1985).

## A. THE EVIDENCE

At the hearing the government presented the testimony of twelve witnesses, offered documentary evidence, and made proffers of other evidence. Defendants offered certain documentary evidence. The court summarizes the testimony of the witnesses as follows.

### 1. Remo Franceschini

Lieutenant Remo Franceschini, the New York City police officer commanding the Queens County District Attorney's squad, testified that he had dealt with two informants who, after John Gotti's release on bail, provided information that he was involved in an illegal gambling enterprise and in loansharking and was the boss of a crew in Queens and especially in Ozone Park. After Paul Castellano, the reputed

"boss" of the "Gambino Crime Family," was assassinated on December 16, 1985, the informants provided information that John Gotti was the new boss of the Family and was "making moves to solidify his position" by meeting with other organized crime figures throughout the metropolitan area.

According to Franceschini he knew one of the informants for ten years and the other for seven, they had provided reliable information resulting in arrests, search warrants, and recovery of stolen property, and their information had been corroborated by independent means such as surveillances.

### 2. John Gurnee

New York City Police Department Detective John Gurnee had for some sixteen years been assigned to gather information on organized crime and for the past eight years particularly on the Gambino Crime Family, using surveillances and informants. He described the hierarchy of the Gambino Crime Family to be the boss, underboss, consigliere, capos, lieutenants, soldiers and associates. He said that as of November 1985 Paul Castellano was the boss, Aniello Dellacroce the underboss, and Joseph N. Gallo the consigliere. Defendant John Gotti was then a capo, and defendant Eugene Gotti was a soldier who answered to John Gotti.

After Dellacroce died on December 2, 1985 and Castellano was assassinated on December 16, 1985 Gurnee received information that there would be a "get together" of the Gambino Family on Christmas Eve at the Ravenite Social Club, 247 Mulberry Street, New York, where Dellacroce had previously conducted his activities. Gurnee surveilled the club and identified many people who he had information were involved in organized crime, including John Gotti, Eugene Gotti, and Rampino.

According to Gurnee, John Gotti was treated with a respect greater than that accorded him in the past. Many bypassed others and went directly up to him and kissed him. He was treated in much the way as Dellacroce had been in the past.

Gurnee also saw John Gotti and one Frank DeCicco walking alone outside the club engaged in conversation, evidently to get out of the hearing of others.

On April 13, 1986 someone assassinated DeCicco. Gurnee surveilled the area of the wake, and saw some two hundred people including John Gotti, Rampino, Carneglia, and Eugene Gotti. When John Gotti came out of the funeral home from time to time he was accorded even more respect than he had received on December 24, 1985. He was the only one Gurnee saw kissed. On one occasion John Gotti was taken to the side of the building away from the crowd and held a private conversation with Joseph Denti, a capo or a soldier in the Lucchese Crime Family, and Joe Armone, a "made man" in the Gambino Crime Family.

Gurnee, on the hundreds of times he surveilled John Gotti, occasionally in the morning but mostly in the afternoon and evening, never saw him at Arc Plumbing, his ostensible employer, or at a location where he appeared to be employed or working. Gurnee always saw John Gotti chauffeured when he traveled in the black four-door Mercedes Benz he had been using for four to six weeks. He had several different chauffeurs. Gurnee had also seen John Gotti chauffeured in Cadillacs, Lincolns and other cars.

### 3. James M. Kossler

James M. Kossler, for more than five years the coordinating supervisor of the FBI for the Organized Crime Squads in the New York area, testified that Special Agent Bruce Mouw had advised Kossler that five different informants provided information that John Gotti was continuing to engage in criminal activity. One of the five said that Eugene Gotti and John Carneglia continued to engage in criminal activity.

The first informant had been such for over thirteen years. His information had resulted in the recovery of more than $1,000,000 worth of stolen property, had

been used to obtain numerous search warrants and electronic surveillance orders, and had been corroborated by the results of the searches and electronic surveillances. The informant reported on all five Cosa Nostra families in the New York area, and told the FBI that, following the death of Paul Castellano, John Gotti was named boss of the Gambino Family, Frank DeCicco underboss, and Joseph N. Gallo consigliere.

The second informant had been a source of the FBI for some two years and was a close associate of the Gambino Family. His information had led to several search warrants and orders for electronic surveillances and had been corroborated by the results. The informant reported on numerous occasions since December 1985 that John Gotti was the boss of the Gambino Family. This source also stated that Eugene Gotti and Carneglia were then engaged in heroin trafficking.

The third informant, a close associate of the Gambino Family who furnished reports on all five Cosa Nostra families, had provided the FBI with information that had been used over three years to obtain more than ten electronic surveillance orders. His information was corroborated by the results. He too advised that John Gotti had become boss of the Gambino Family.

The fourth informant, an FBI source for over three years, had provided information that led to search warrants, orders for electronic surveillance, and twelve arrests, and had resulted in the recovery of more than $500,000 in cash and narcotics. The informant learned in conversations with members of the Gambino Family that John Gotti had become boss of that Family.

The fifth FBI informant had been such for approximately three years. His information had been used to obtain one search warrant and one order for electronic surveillance. He also said John Gotti had become boss of the Gambino Family.

Special Agent Kossler also testified that the FBI had conducted surveillance on February 25, 1986 at 1628 Bath Avenue, Brooklyn, known as a social club run by

Frank DeCicco. According to the surveillance log the agents observed John Gotti and Eugene Gotti there while Frank DeCicco was present. Also present were Joey Watts, a close associate of the Gambino Family, Joey Scopo, the son of Ralph Scopo, a member of the Colombo Family, and Joe Corrao and Robert DeBernardo, members of the Gambino Family.

The FBI also conducted surveillance and took photographs at Gargiulo's Restaurant, West 15th Street, Coney Island, on January 17, 1986. According to the agents John Gotti arrived at 12:55 P.M. with Frank DeCicco. Also present were Robert DiBernardo, mentioned above, and John Riggi, boss of the DeCavalcante Family in New Jersey, and Vincent Rotundo, its underboss.

### 4. Kenneth McCabe

Kenneth McCabe, formerly in the New York City Police Department assigned for seventeen years to the Kings County District Attorney's Squad, has been since early December 1985 a criminal investigator with the United States Attorney's Office in the Southern District of New York. He has previously been qualified and testified in federal courts concerning the structure and membership of organized crime in New York and the identities and rank of various persons in organized crime.

On December 3, 1985, the day after the death of Aniello Dellacroce, McCabe conducted surveillance in the vicinity of the Ravenite Social Club on Mulberry Street. He saw John Gotti, Frank DeCicco and Joseph Watts in conversation a few doors from the club. When they saw McCabe they broke off their discussion. Near the social club was a 1985 Lincoln registered to Arc Plumbing and used by John Gotti.

McCabe testified that as of December 3, 1985 John Gotti and Frank DeCicco were capos in the Gambino Crime Family and Watts was an associate.

Later that same evening McCabe saw John Gotti at the Andrea Doria Social Club, 140 Mulberry Street, run by Joseph Corrao,

a capo in the Gambino Crime Family. Also present were Corrao, Frank DeCicco, Joseph Watts, August Sclafani and Frank Low. The latter two were associates of the Gambino Crime Family.

On the next day, December 4, 1985, McCabe conducted surveillance at the wake of Aniello Dellacroce. Present were, among others, John Gotti, Carneglia, Rampino, Frank DeCicco, Eugene Gotti, and other members of the Gambino Crime Family.

After the assassination of Castellano in mid-December 1985 McCabe surveilled 1468 86th Street in Brooklyn, the Veterans and Friends Social Club, a place frequented by members and associates of the Gambino Crime Family, including Castellano while he was alive and Frank DeCicco. Although McCabe had conducted surveillance of this club hundreds of times in the past, he saw John Gotti there for the first and only time on December 22, 1985. Also present were Joseph Messina, acting boss of the Bonanno Crime Family, as well as Joseph Armone, Salvatore Auriello, Frank DeCicco, James Failla, and Angelo Ruggierio, all capos in the Gambino Crime Family. Rampino was also present.

There appeared to be a meeting in progress at the club. There were separate small meetings outside in the street, sometimes between John Gotti and Frank DeCicco, on occasion joined by Joseph Armone. Messina and Failla were often outside in conversation with various persons. Some people went back and forth between the nearby Thomasso's Restaurant and the club. McCabe concluded that this was to forestall the possibility that the conversations would be overheard through eavesdropping devices or otherwise.

McCabe conducted surveillance of the Ravenite Social Club on January 23, 1986. He saw John Gotti there at 8:40 P.M. Present also were Frank DeCicco and others identified as associated with the Gambino Crime Family.

McCabe also conducted surveillance at the wake of DeCicco in mid-April 1986 at the Scarpacci Funeral Home in Brooklyn.

In attendance, among others, were John Gotti, Rampino, Carneglia, Eugene Gotti, and Bobby Boriello, sometimes a chauffeur for John Gotti. At the wake John Gotti received considerably more respect than he had when observed previously by McCabe. As he entered and left the funeral home people held umbrellas for him, others stepped out of his way, others kissed him.

On April 21, 1986 McCabe surveilled the social club at 1628 Bath Avenue, Brooklyn and saw members and associates of the Gambino Crime Family.

McCabe also testified that according to his information John Gotti became boss of the Gambino Family and Frank DeCicco became underboss, and that John Gotti, Carneglia, Eugene Gotti and Rampino had continued to engage in the criminal activity of the Gambino Crime Family.

### 5. Andrew Rosenzweig

Andrew Rosenzweig had been for fifteen years with the New York City Police Department and for the past three years Chief of the Investigations Bureau for the New York County District Attorney. He surveilled the Ravenite Social Club on December 24, 1985. Among the large group of people, he saw John Gotti, Eugene Gotti, Frank DeCicco and Rampino. He walked behind John Gotti and DeCicco as they proceeded together south on Mulberry Street away from the club. They then turned around and walked toward Rosenzweig. As they turned he heard Gotti say "they've got to come to me."

Rosenzweig also testified that after the death of Castellano a reliable informant of one year's standing said that John Gotti was one of several being considered to head the Gambino Crime Family.

### 6. William Tomasulo

New York Police Department Detective William Tomasulo has been assigned to the Brooklyn South Detective Task Force for five years and has been a police officer for eighteen and a half years. When on April 13, 1980 Frank DeCicco was murdered To-

masulo went to the site to investigate. At one point he and four detectives left the assassination site and proceeded to the social club at 1628 Bath Avenue, previously owned by Frank DeCicco. There one of the officers knocked on the door and said "open the door." Tomasulo saw through the window that Robert Fapiano reached in the small of his back, removed a nine millimeter automatic handgun, loaded it, and pointed it at the door. The officer, who had not previously identified himself as a police officer, then said "Police, open up." Tomasulo then saw Fapiano run to the bar, bend down with other men, and "stash" the gun away.

The police then entered, later searched the club, and recovered four handguns from a hollowed out section under the bar and covered by carpeting. One of the guns, a .38 caliber Smith and Wesson had been stolen in 1973 along with twenty-three others. In 1976 another of those twenty-three had been recovered from Peter Gotti and Frank Scaglione. Tomasulo arrested Fapiano for possession of the gun.

### 7. Harvey Charyn

Detective Harvey Charyn, of the Brooklyn South Detective Task Force, was also assigned to investigate the homicide of Frank DeCicco. On April 21, 1986, eight days after the homicide, he drove past the social club at 1628 Bath Avenue at about 1:40 P.M. and saw John Gotti enter the club. Joe DeCicco, Frank DeCicco's uncle, was in the doorway of the club.

### 8. Thomas Donohue

New York City Police Sergeant Thomas Donohue testified that on September 11, 1984 he and Officer Raymond Doyle went to the vicinity of 72nd Street and Grand Avenue in Queens where one Romul Piecyk claimed he had been assaulted and robbed. He stated that the individuals who beat him were still in the area because their car, a white Cadillac or Continental, was parked nearby. Donohue, Doyle, and Piecyk went to Cono, The Fisherman's Restaurant at 72nd Street and Grand Avenue. Piecyk looked through the window and identified John Gotti and Frank Colletta as the men who beat him up and took his money. Donohue told them to stand up, and all eight to ten men at the table stood up. Piecyk asked that they be arrested. The officers then arrested Gotti and Colletta and took them to the precinct for processing.

At the precinct Piecyk told the officers that a car had been double parked so that he could not pass. After he started blowing his horn Colletta came over and hit him in the face and took cash from his top pocket. Piecyk got out of his car and tried to get back the money. After a tussle between Colletta and Piecyk, Gotti came over and hit Piecyk and made a motion as if to take something from his waistband. However, Piecyk saw no weapon.

When the police arrived Piecyk's face was puffed up and his arm and hand had abrasions and blood on them.

### 9. Raymond Doyle

New York City Police Officer Raymond Doyle, who was Donohue's partner on September 11, 1984, also testified to the Piecyk incident. His testimony was substantially the same as that of Donohue. Doyle added that when Gotti and Colletta were told to come out from the table at the restaurant Gotti said "Do you know who I am," and later, while Doyle was placing handcuffs on him, said "Let me talk to this guy."

### 10. Anthony Falco

Sergeant Anthony Falco, assigned to the Queens County District Attorney's Detective Squad, testified that Piecyk testified before the Queens County grand jury and identified John Gotti and Colletta as the persons who assaulted and robbed him. The grand jury then issued an indictment against them on September 21, 1984.

On February 24, 1986 at about 7:25 P.M. Sergeant Falco met with Piecyk in front of his residence in Queens. Piecyk told Falco that he had no intention of testifying at trial, saying that "because of Gotti's people" he was in fear of his life and his wife's

safety. He pointed to a van outside the house owned by his employer but used by him and said his employer had just spent $450 to repair the brakes, which he believed had been tampered with by "Gotti's people." He also told Falco that he had received numerous telephone calls in the late evening and early morning hours, calls of "no substance" where the callers simply hung up. He believed these to be from "Gotti's people." Although Falco offered the services of the police department to check the brake linings in the van, Piecyk refused on the ground that the presence of the police might further endanger his life.

After the New York Daily News published a story on March 6, 1986 that Piecyk had said he was frightened not by Gotti but by the District Attorney, Falco took Piecyk into custody on March 22, 1986 pursuant to a material witness warrant. At the office of the Queens District Attorney's Detective Squad Piecyk began to cry and asked to speak to Falco alone. Falco took Piecyk alone into an office where he apologized for his behavior and stated that he was not really mad at the authorities, but it was "just that he was afraid." He said that he was afraid for himself and his wife and was afraid of "Gotti's people."

At the trial of the case Piecyk testified that he was unable to identify the person who assaulted him, and the case was dismissed.

### 11. Kenneth W. Quirk

Kenneth W. Quirk, a prospective witness in this case and a court officer and president of the New York State Court Officers Association representing all court officers in New York City, had some years ago made a public statement that Charles Carneglia was involved in the homicide of Albert Gelb, whose killing by John Carneglia is alleged as one of the predicate acts in the present case. Quirk had also appeared on television shows a few years after that homicide and advanced the theory that Gelb was killed as a result of embarrassing certain members of organized crime in an incident that took place in a diner in Queens.

On April 2, 1986 a former neighbor called Quirk's house to say that two white males had appeared at her house, two houses away from Quirk's former residence, and asked where he could be located. They claimed to be detectives. When she asked for identification they produced what appeared to be a silver badge "but very quickly." She told the men Quirk had moved and in response to their question replied she did not know where he had gone.

After being informed of this incident Quirk checked and determined that no one from the police department had been seeking to talk to him.

Six days later, on April 8, 1986, at about 8:30 A.M. Quirk was driving his car on Slosson Avenue, Staten Island, preparing to make a left turn to go on to the Staten Island Expressway. The car windows on both sides were half way down. A black or dark blue four door Mercedes with tinted windows (having the same appearance as the car in which John Gotti is driven) and occupied by two males, pulled up on Quirk's right side. The driver was a white male, aged 35 to 40, with dark, receding hair. One of the occupants of the car yelled out "We want to talk to you about the Gelb case." Quirk made his left turn and pulled over and stopped on the ramp to the Staten Island Expressway, but the Mercedes continued on Slosson Avenue underneath the expressway. Quirk attempted to back off the ramp to catch sight of the individuals but did not see them.

### 12. Edward Magnuson

Special Agent Edward Magnuson had been with the Drug Enforcement Administration for fifteen years and is now a group supervisor. He testified that he had spoken with a confidential informant of one year's standing who had been paid $6000 for information provided in the last year. The informant's information had led to three arrests and to the seizure of drugs, money, and drug paraphernalia. The infor-

mant also provided general intelligence information about organized crime activity in New York. The agent in contact with the informant deems the quality of his information to be excellent. At present the informant is engaged in two ongoing investigations of the Drug Enforcement Administration.

The informant has in the past year provided information about John Gotti and his crew in the Gambino Family, and has known members of that crew since the mid-1960's. The informant said after the death of Paul Castellano members of the Bergin Hunt and Fish Club and other members of the Gambino Family told him that before Paul Castellano's death Armond Dellacroce, a defendant in this case and now a fugitive, had told John Gotti "If we can get rid of Paul, then we can take over the family."

According to the informant, after Castellano's killing various members of the Bergin Hunt and Fish Club and other Gambino Family members told him some six or seven times that John Gotti was the boss and that Frank DeCicco had "jumped over" someone to become underboss.

About three or four days before DeCicco's killing on April 13, 1985 the informant told his contact agent that members of the Bergin Hunt and Fish Club and other members of organized crime had told him something bad was going to happen.

When asked by Magnuson whether he knew that the Gotti crew had continued to conduct criminal activities, the informant replied "business as usual." He also told Magnuson that there was a "tremendous problem" between the Castellano faction and the Gotti faction, that John Gotti was very angry because of the murder of Frank DeCicco, and that when Gotti "got out on bail or when this trial was over, there was going to be war and John would take his revenge on them."

The informant said that within the previous week he saw twenty "shooters" or "enforcers" outside the Bergin Hunt and Fish Club while John Gotti was inside.

With respect to the Piecyk case the informant said that members of the Bergin Hunt and Fish Club and other members of the Gambino Crime Family told him that the witness "had received a kick in the ass," by which the informant meant the witness "was warned not to testify."

The court discusses below other evidence and proffers of facts claimed to bear on the issues.

### B. RISK OF INTIMIDATION OF WITNESSES

#### 1. John Gotti

The court first considers whether it should exercise its inherent power to impose detention on John Gotti on the ground that there is substantial evidence that he would influence or intimidate witnesses.

The court finds credible the testimony of the three officers, Donohue, Doyle and Falco concerning the Piecyk incident. They established that Piecyk complained to the officers about an assault, appeared to have been recently beaten, and in the restaurant identified John Gotti and Colletta as the assailants. When the officers asked them to stand up, all eight to ten men stood. Gotti then said "Do you know who I am" and "Let me talk to this guy." Piecyk testified before the grand jury that issued an indictment against them.

Defendants attack Piecyk's credibility, offering evidence of complaints against him in 1972, 1973 and 1975 accusing him of violent and threatening acts and of theft. The record shows he had one conviction, and that was for disorderly conduct based on the 1975 charges. In any event the Queens County grand jury was sufficiently persuaded by Piecyk's testimony to issue an indictment.

By the time the District Attorney was preparing the case for trial in early 1986, Piecyk said he would not testify. He told Falco that he was then in fear of his life because of "Gotti's people," that he had received many telephone calls in the late evening and early morning hours where the callers simply hung up, and that persons he

believed to be "Gotti's people" tampered with the brakes on the van that he used, to the degree that his employer spent $450 to repair them.

Defendants introduced a newspaper story appearing in the New York Daily News dated March 6, 1986 in which Piecyk is quoted as saying that it was not John Gotti who was "scaring the daylights" out of him but the District Attorney, that he never told the prosecutors about death threats or harassment or brake cutting, and that he would go to court and testify on Gotti's side. Piecyk also made similar statements to a television reporter.

On March 22, 1986 Falco took Piecyk into custody as a material witness. Piecyk started to cry and, evidently referring to his public statements, apologized for his behavior and said he was not really mad at the authorities but was just afraid of Gotti's people. At the trial he testified that he could not identify John Gotti and Colletta as the men who assaulted him, with the result that the case was dismissed.

According to the informant who spoke to Magnuson and had known members of John Gotti's crew in the Gambino Family for some twenty years, Piecyk "had received a kick in the ass" or, as the informant explained, "was warned not to testify."

It is highly unlikely that Piecyk, had he not believed that John Gotti was one of the assailants, would have identified him to the officers as such and have so testified before the grand jury. No motive for Piecyk to make a false identification appears. In fact he then apparently had no knowledge of who John Gotti was. It therefore is reasonable to conclude that something frightened Piecyk into changing his mind.

It was suggested that that something may have been merely that Piecyk had read in the newspapers that John Gotti had become boss of the Gambino Crime Family and had a reputation for violent and impulsive behavior. The court does not find that suggestion plausible. Had Piecyk acquired a generalized fear of John Gotti solely because of his reputation, Piecyk would have

simply claimed he made a mistake in his original identification. He would hardly have tempted Gotti's displeasure by accusing his "people" of making telephone calls and tampering with brakes. Those specifics are not the kind of thing Piecyk would readily concoct. Indeed, they have the ring of truth.

His later inconsistent statements to the New York Daily News and the television reporter are wholly compatible with Piecyk's fear of retaliation at Gotti's hands, as are both the refusal to identify Gotti in court and the statement to the newspaper "I'm not going to go [to court] against Mr. Gotti ... I'm going in his behalf." The failure to identify Gotti is wholly inconsistent with Piecyk's identification made at the time of the incident, with his testimony to the grand jury, and with his statements to Falco.

Finally, the statement of the informant to Magnuson that Piecyk had been warned not to testify confirms the essential truth of his statements to Falco concerning the telephone calls.

■ There is thus substantial evidence to show that Piecyk received a warning not to testify. It is also clear that such a warning stemmed from John Gotti or from others at his direction. Gotti had a clear motive to prevent Piecyk from testifying and the boldness to try to accomplish that end. Gotti's remarks at the time of his arrest indicate a disposition to induce Piecyk not to pursue the matter and an expectation that knowledge of "who I am" would lend emphasis to any suggestion that Piecyk abandon his complaint.

As discussed hereafter, there is clear and convincing evidence that while on bail in this court under conditions requiring him to refrain from the commission of crime, John Gotti saw fit to seek out and to obtain the position of boss of the Gambino Family. It is a bold, not to say reckless, man who will act in that way when under the present indictment alleging that the Gambino Family has engaged in serious criminal activity. Moreover, the hearings before this court

concerning the informant status of Johnson and Battista evoked substantial evidence that the Gambino Family, the Gotti crew, and John Gotti himself had engaged in extensive criminal conduct in the past. There is thus no basis for attributing to John Gotti a hesitancy to suggest to those over whom he was boss measures calculated to persuade Piecyk not to identify him.

The evidence as to the Quirk incident, while perhaps not in itself enough to show that John Gotti, or men acting at his direction, attempted to intimidate a witness in violation of 18 U.S.C. § 1512, certainly lends credence to the inference that he was and is prepared to subvert the integrity of the trial. It is unlikely that persons unrelated to this case and to John Gotti would act as bogus "detectives" to try to find Quirk and, while driving a Mercedes apparently identical to that in which John Gotti is chauffeured, would approach Quirk on the road saying they wished to talk about the Gelb homicide.

The government also claims that John Gotti's past behavior shows a propensity to tamper with the judicial process, proffering that he had a hand in the decision that led to the murder by defendant Johnson of Anthony Plate, a codefendant of underboss Aniello Dellacroce in a racketeering case in the Southern District of Florida. The government asserts that the purpose of the murder was to improve the chances of acquittal for Dellacroce. In the light of the other evidence the court need not determine what weight, if any, it should give to this proffer.

■ The court concludes that there is substantial evidence that John Gotti, after he was admitted to bail, intimidated Piecyk and that if continued on bail John Gotti would improperly influence or intimidate witnesses in this case. The court also finds, for reasons stated above, that no conditions of release will assure that John Gotti will not improperly influence or intimidate witnesses.

Since all three judges who sat in the *Melendez-Carrion* case, *supra*, agreed that the Fifth Amendment did not disable the court from detaining a defendant who will probably intimidate a witness, there is no reason to consider under this heading the other ramifications of that decision.

*2. John Carneglia and Eugene Gotti*

The government urges that John Carneglia and Eugene Gotti have demonstrated that they have intimidated witnesses and will continue to do so unless detained. The government points to acts which Carneglia and Eugene Gotti allegedly committed before the commencement of this prosecution. The indictment in this case charges that John Carneglia murdered Albert Gelb in 1976, and the government claims to have evidence to show that John Carneglia committed the murder to prevent Gelb from testifying in a criminal case against John Carneglia's brother Charles. Further, the indictment in *United States v. Ruggiero*, CR 83–00412, pending in this court, alleges that John Carneglia and Eugene Gotti obstructed justice. That indictment charges they tried to obstruct a grand jury and altered and concealed evidence relating to the grand jury's investigation. The indictment further accuses Eugene Gotti of tampering with witnesses before the grand jury and urging a witness to testify falsely in the grand jury.

These indictments establish probable cause to believe that Carneglia and Eugene Gotti committed the crimes alleged. *United States v. Contreras*, 776 F.2d 51 (2d Cir.1985).

The government also offered tapes and transcripts of four conversations recorded in 1982 by means of a "bug" in the house of Angelo Ruggiero. The government asserts that three of the conversations concern a scheme in which Ruggiero, Carneglia and Eugene Gotti participated to bribe someone at the telephone company to determine whether there was court ordered electronic surveillance of their homes or the home of John Gotti. According to the government the fourth conversation concerns a decision on the question of whether to invest $5000 to get information from a

corrupt source supposedly close to the Nassau County District Attorney. Eugene Gotti's statement was: pay the money "just to get the hook in there."

These facts, whatever may have been their force had they been presented at the defendants' first appearance before the court in March 1985, were known to the government long in advance of that date. At that "first appearance" the government could have asked, under 18 U.S.C. § 3142(f), for a detention hearing on the ground that there was a "serious risk" that the defendants would attempt to obstruct justice, or intimidate a prospective witness or juror. The court would then have been obliged to hold such a hearing "immediately."

Section § 3142(f) of Title 18 contemplates that if an application to detain a defendant on the ground that he is a risk to intimidate witnesses is based solely on facts occurring and known to the prosecutor before arraignment, the hearing on the application must take place no later than at the defendant's "first appearance" before the judicial officer. *Cf. United States v. Payden,* 759 F.2d 202 (2d Cir.1985). To that extent Congress evidently restricted the court's inherent power to detain a defendant who poses a risk to intimidate witnesses.

Here the government knew, long before the arraignment of Carneglia and Eugene Gotti, the facts cited above and made no application to detain them. The court could now consider their acts prior to arraignment and determine to revoke their bail had the government presented evidence of acts after arraignment increasing significantly the likelihood that they posed such a risk. But the government offered no such evidence at the hearing.

■ The fact that while on bail Carneglia and Eugene Gotti may have committed other crimes and gone to meetings and wakes attended by John Gotti and other members of the Gambino Family is not sufficiently probative of an intent to intimidate witnesses to justify opening the issue.

The court concludes that there is insufficient evidence of acts committed by Carneglia and Eugene Gotti subsequent to their arraignment to warrant the court to consider now, in the exercise of its inherent power, the issue of whether they should be remanded as risks to intimidate witnesses.

### C. COMMISSION OF CRIMES AFTER ARRAIGNMENT

As noted above, 18 U.S.C. § 3148(b) provides that the court "shall" revoke the bail of a defendant and order his detention if the court finds that there is "probable cause to believe" the defendant has committed a crime while on release and that no conditions will assure he will not pose a danger to any person or the community or that he is unlikely to abide by such conditions.

The substantial evidence recited above concerning the Piecyk incident establishes that while on bail John Gotti committed a crime, namely, tampering with a witness in violation of section 215.10 of the New York Penal Law.

No published decisions appear to have addressed what showing is necessary to meet the standard of "probable cause" under 18 U.S.C. § 3148(b). In the context of "probable cause" to execute a search and seizure the Second Circuit has said that a "more likely than not" test is appropriate, *United States v. Wabnik,* 444 F.2d 203, 205 (2d Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 91 (1971), while the First Circuit has adopted a less stringent standard. *See United States v. Melvin,* 596 F.2d 492, 495 (1st Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979) ("probable cause" is the equivalent of "reasonable cause" or "reasonable grounds to believe"). In *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983), Justice Rehnquist, in a plurality opinion, suggested that "probable cause" to seize items believed to be stolen "does not demand any showing that such a belief be correct or more likely true than false."

■ Here what is at stake is the deprivation of liberty before trial and not just a seizure of property. The considerations discussed in the *Melendez-Carrion* case, *supra,* suggest that due process may require a higher standard in this case than in a seizure case. The court should, of course, interpret legislation to avoid constitutional issues. *See Wolston v. Reader's Digest Ass'n, Inc.,* 443 U.S. 157, 160 n. 2, 99 S.Ct. 2701, 2703 n. 2, 61 L.Ed.2d 450 (1979). The court therefore holds that where pre-trial detention is at stake it should interpret "probable cause to believe" as used in 18 U.S.C. § 3148(b) to mean that the belief be more likely true than false. *Cf. United States v. Payden,* 768 F.2d 487, 490 (2d Cir.1985).

■ The substantial evidence showed at least that it is more probable than not that John Gotti committed the crime of intimidating Piecyk. Indeed, in the court's view the evidence exceeded that standard. But even if it be thought that the proof no more than met it, the court deems it consistent with the due process clause of the Fifth Amendment where the crime is one bearing on the integrity of the judicial process. Surely there is a weighty interest in preventing jeopardy to a fair trial in, as Judge Newman put it in the *Melendez-Carrion* case, *supra,* at 1002, "a constitutional scheme that relies on the trial process to determine guilt and enforce the criminal law." Where the evidence establishes that it is more likely than not that a defendant, unless detained, will pervert that process, the Fifth Amendment does not require that he be left at large to do so.

The court does not address the constitutional validity of the provision of 18 U.S.C. § 3148(b) providing that the commission of a felony by a defendant while on release establishes a rebuttable presumption that the defendant should be detained. The court need not invoke the presumption because, for reasons already indicated, the court has found that there is substantial evidence that John Gotti is unlikely to abide by any conditions of release.

The government contends that the proof shows that John Gotti, in addition to intimidating Piecyk, has continued to commit the very crimes he has been indicted for in this case. The reasoning is as follows. The indictment establishes probable cause to believe he participated in conducting the affairs of a racketeering enterprise through "a pattern of racketeering activity" in violation of 18 U.S.C. § 1962(c) and conspired to do so in violation of 18 U.S.C. § 1962(d). The evidence at the hearing showed that the enterprise and the Gambino Crime Family continued to function, that Gotti while on bail went so far as to seek out and obtain the position of "boss" of that Family, and that the members of that Family, including Carneglia and Eugene Gotti, committed racketeering acts while under John Gotti's direction.

The evidence detailed above establishes clearly and convincingly that following the assassination of Paul Castellano in December of 1985 John Gotti became boss of the Gambino Family. Nine different confidential informants gave that information to the FBI, the Drug Enforcement Administration, and the New York City Police Department. Defendants attribute all this to rumor, fed perhaps by law enforcement officials' statements to the press.

But the information was corroborated by visual observations of John Gotti's meetings with members of the Gambino Family and other families, and of the marks of increased respect accorded him after Castellano's assassination, a respect comparable to that previously accorded Dellacroce as underboss. The information is further confirmed by the testimony of Rosenzweig who overheard John Gotti say to Frank DeCicco "They've got to come to me." It is true that Rosenzweig heard only this remark. But, put in the context of the observations at the surveillances and the reports of informants, John Gotti's statement is fairly interpreted to mean that he was seeking to become boss.

However, in order to show probable cause to believe that John Gotti violated 18 U.S.C. § 1962(c) and (d) it is not enough to

prove that the Gambino Family continued to exist and that John Gotti became its boss. The government was also required to show probable cause to believe that members or associates of that Family participated in the conduct of the affairs of the Family through a "pattern of racketeering activity" or committed some acts in furtherance of a conspiracy so to participate.

The government sought to demonstrate this element by statements attributed to informants. Franceschini testified that two informants told him that Gotti continued to lead a crew in Ozone Park committing the crimes of gambling and loansharking. Magnuson reported that an informant advised him it was "business as usual" at the Bergin Hunt and Fish Club, the headquarters for John Gotti's crew. One FBI informant reported that Carneglia and Eugene Gotti were engaged in heroin trafficking. McCabe testified that informants stated that John Gotti, Carneglia, Eugene Gotti, and Rampino continued to engage in "criminal activity."

■ To establish probable cause to believe that John Gotti violated 18 U.S.C. § 1962(c) and (d) something more is needed than these generalities attributed to informants. Perhaps so as not to jeopardize continuing investigations, the government did not furnish the court with dates, times, places, or any other details of the alleged crimes. Without such details the court has no means of testing the credibility of the informants' conclusions. The court therefore finds that the government has not shown probable cause to believe that John Gotti, Carneglia, and Eugene Gotti, while on bail, violated 18 U.S.C. § 1962(c) and (d).

The government seeks to remand Carneglia on the ground that in December 1985 while on release he committed the crime of assaulting a federal agent on duty. When the prosecutor then brought the matter to the attention of the court she took the position that the incident did not warrant Carneglia's remand and merely urged the court to increase his reporting requirements. The court did so. No new facts have been drawn to the court's attention that would justify a change in that disposition.

## D. THE COURT'S POWERS UNDER 18 U.S.C. § 3142(c)

The last sentence of 18 U.S.C. § 3142(c), a section devoted to "release on conditions," reads: "The judicial officer may at any time amend his order [permitting pretrial release] to impose additional or different conditions of release." *Dictum* in *United States v. Resek, supra,* 602 F.Supp. at 1129–30, suggests that this language permits the court to amend an order of release to require detention when the defendant does things that, while not criminal, show he is dangerous to the safety of other persons or the community.

The issue arises because under 18 U.S.C. § 3148 a revocation of release may only be invoked where there is probable cause to believe the defendant committed a crime or clear and convincing evidence that he violated some other condition of release. Yet it may become clear only after a defendant's release that he has become dangerous though he has committed no further crime and violated no condition of release. To leave him at large would seem to frustrate Congress's central purpose in providing for pretrial detention.

Had John Gotti not committed the crime of intimidating Piecyk the present case would require the court to decide the issue. As already noted, the government has not shown probable cause to believe John Gotti committed a violation of 18 U.S.C. § 1962(c) and (d). Yet he undertook while on release to obtain the position of boss of the Gambino Family. That in itself might not be enough to show increased dangerousness. But an informant reported that because of DeCicco's murder John Gotti was very angry and that when he got out on bail or when the trial was over there would be war and he would take his revenge. That strikes the court as the attitude of a "boss" who can fairly be described as dangerous to other persons and therefore worthy of detention.

Yet it does not seem justifiable to this court to read a sentence permitting it to impose different conditions of "release" as authorizing "detention." Perhaps Congress simply did not foresee the problem. But this court would not be prepared to read statutory language in a sense quite contrary to its accepted meaning. Therefore, it would not detain John Gotti on the theory that 18 U.S.C. § 3142(c) authorizes it to do so. Congress, if it wishes to address the issue, has the means to do so.

### E. ADDITIONAL CONDITIONS OF RELEASE FOR CARNEGLIA, EUGENE GOTTI AND RAMPINO

■ The court has, of course, power to amend its orders of release of Carneglia, Eugene Gotti, and Rampino, and to impose additional conditions of release. Each has been shown to have consorted with other members of the Gambino Family, and there has been some evidence from informants that Carneglia and Eugene Gotti may have engaged in criminal activity. The court therefore orders each of the three to:

1. maintain legitimate employment, or, if unemployed, actively seek such employment;

2. avoid all contact, directly or indirectly, with any person known to possess a criminal record, or with any members or associates of the Bergin Hunt and Fish Club, the Our Friends Social Club, the Ravenite Social Club, the Andrea Doria Social Club, the Veterans and Friends Social Club, and a social club at 1628 Bath Avenue, Brooklyn, except to the extent necessary when meeting with codefendants in the presence of their attorneys to prepare for proceedings in this or another criminal case;

3. stay away from the vicinity of the above clubs;

4. avoid all contact, directly or indirectly, with the codefendants in this case, except to the extent necessary when meeting with the attorneys to prepare for proceedings in this or another criminal case;

5. avoid all contact, directly or indirectly, with any potential witness who may testify in this case; and

6. refrain from possessing a firearm, destructive device, or other dangerous weapon.

The court orders Rampino, in addition, to:

7. report twice weekly to the probation department's pretrial services for urinalysis and comply with whatever drug treatment that department deems appropriate.

### F. OBJECTIONS TO THE PROPRIETY OF THE GOVERNMENT'S MOTION

Defendants ask that the court dismiss the government's motion on the grounds that (A) the affidavit attached to the motion papers is conclusory and gave inadequate notice to defendants, and (B) the motion was brought in bad faith and in a spirit of vindictiveness without a basis for belief that there was sufficient evidence to justify revocation of bail.

There is not the slightest merit in these contentions. Defendants had a full opportunity to meet the government's proof. Moreover, irrespective of the government's motive, there is a public interest in the detention of those who are likely to intimidate witnesses or to commit crimes while on release.

### G. CONCLUSION

The court (A) revokes the release of John Gotti and orders that he be detained for the reasons stated above and with the conditions set forth in 18 U.S.C. § 3142(i), and (B) amends the orders of release of Carneglia, Eugene Gotti, and Rampino to add the conditions set forth above.

The court stays the execution of the order as to John Gotti until noon May 19, 1986 to enable him to apply to the Court of Appeals for a further stay.

So ordered.